**INDIANA FEDERATION OF DENTISTS, an unincorporated association, Petitioner,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

**No. 83–1700.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 9, 1984.

Decided Oct. 11, 1984.

As Amended Oct. 12, 1984.

Rehearing and Rehearing En Banc Denied Dec. 21, 1984.

Bruce W. Graham, Trueblood, Fountain, Graham & O'Reilly, Lafayette, Ind., for petitioner.

Howard Shapiro, Federal Trade Comm., Washington, D.C., for respondent.

Before PELL and COFFEY, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

COFFEY, Circuit Judge.

The Indiana Federation of Dentists ("IFD") petitions this court to review an order of the Federal Trade Commission ("Commission") requiring the IFD and its member dentists to "cease and desist from engaging" in a collective refusal to comply with the group dental health care insurers' directive to submit copies of a patient's dental radiographs along with the patient's insurance claim form. We conclude that under a rule of reason analysis, the evidence presented at the administrative hearing failed to establish that the conduct of the IFD and its member dentists had an anticompetitive effect in a relevant market. Accordingly, we vacate the Commission's "cease and desist" order.

## I

The parties admit that the controversy in this case arises from two alleged cost-containment provisions that insurance companies include within their group dental health care plans.[1] These provisions are entitled "predetermination of claims" and "least expensive adequate course of treatment." According to the former plan, the dentist and patient may, at their discretion, submit a proposed course of dental treatment to the insurer for review. The insurer, in turn, will provide the dentist and patient with an estimate of the insurance benefits to be paid for the proposed treatment. The "least expensive adequate course of treatment" plan provides that for

---

1. The record reveals that group dental health care plans originated in Indiana in the early 1970's. These plans were, at the time of this lawsuit, included in collective bargaining agreements for the benefit of union-member employees. Neither the ALJ nor the Commission found that the alleged cost-containment provisions included within these plans actually lowered the insurers' dental costs.

all courses of dental treatment, whether proposed or completed, the group dental health care insurer will pay benefits only for the least expensive treatment that is "commonly accepted as providing good dental care." *Indiana Federation of Dentists*, 101 F.T.C. 57, 159 n. 4 (1983).

In an effort to enforce these alleged cost-containment provisions, the group dental health care insurers direct dentists to submit copies of a patient's dental radiographs ("x-rays") along with the patient's insurance claim form. The claim form and x-rays, if submitted, are initially reviewed by lay personnel employed by the insurance company.[2] These lay employees have the authority to approve the proposed or completed course of dental treatment. If an insurer's lay employee questions a particular course of treatment, the claim form and x-rays are transmitted to a licensed dentist, selected and hired by the insurer to review dental claims. Based upon an analysis of the claim form and x-rays alone, without a patient case history much less a complete dental examination, the insurer's employed dentist determines the least expensive type of treatment that will, from the insurer's standpoint, provide "good dental care."

The instant case concerns the practice of the 84 current and 8 former IFD member dentists who collectively refused to comply with the group dental health care insurers' directive to submit copies of a patient's

dental x-rays along with the patient's insurance claim form. The IFD maintains that "[p]roper diagnosis and treatment planning predicates the doctor correlating *all* diagnostic aids, with a history and with all clinical findings." *Id.* at 119, 129 (emphasis added). In accord with this policy of quality and proper dental care, the IFD member dentists "provide all diagnostic aids [including x-rays] to third parties on an in-office basis and with the consent of the patient." *Id.* at 121–22.[3] Furthermore, it is the IFD policy that the insurers' employed dentists conduct this examination and review of all diagnostic and clinical aids used in formulating a proper course of dental treatment. Pursuant to Indiana law, "[a]ny person ... who ... offers to diagnose or professes to diagnose ... any of the lesions or diseases of the human oral cavity, teeth, gums, maxillary or mandibular structures" is practicing dentistry and must be licensed. Ind.Code §§ 25–14–1–1, 25–14–1–23 (1982). The IFD asserts that the unlicensed lay personnel employed by group dental health care insurers to review claims engage in the unlawful practice of dentistry when they examine and "diagnose" dental x-rays for purposes of benefit determination. Thus, the IFD concludes that the submission of dental x-rays to unlicensed lay personnel for diagnostic procedures is aiding and abetting the unlicensed practice of dentistry in violation of Indiana state law.[4]

**2.** The lay personnel employed by the group dental health insurers to review a patient's claim form and dental x-rays are not licensed to practice dentistry within the State of Indiana, and thus have no formal dental or radiological training.

**3.** The group dental health care insurers are commonly referred to as "third parties" or "third party payers." *See Indiana Federation of Dentists*, 101 F.T.C. at 57, 61.

**4.** The Indiana state legislature created the Board of Dental Examiners to administer and enforce the "laws pertaining to the practice of dentistry and of dental hygiene." Ind.Code § 25–14–1–13(a) (1982). In furtherance of this duty, the Board is required to "adopt a code of professional conduct and ... adopt rules and regulations establishing standards for the competent practice of dentistry or dental hygiene." *Id.* In April 1982, some three and one-half

years after the Commission filed its complaint in the instant case, the Board enacted new regulations governing the competent practice of dentistry within the State. According to the Board, "[a]ny person using dental diagnostic materials [including dental radiographs, *see* 828 Ind.Adm. Code 1–4–1(3) ] for the purpose of recommending changes in the treatment plan upon which benefits are based is practicing dentistry and must be a dentist." 828 Ind.Adm.Code 1–4–2 (1984). Furthermore, the Board provides that "Indiana dentists shall not knowingly submit dental diagnostic materials to any party involved in the Unauthorized Practice of Dentistry." 828 Ind.Adm.Code 1–4–3. The IFD contends that unlicensed lay personnel do, in fact, examine dental x-rays and recommend changes in dental treatment when they question a course of dental treatment. Accordingly, the IFD claims that submission of a patient's dental x-rays to unlicensed lay personnel for diagnostic

According to the findings of fact of the Administrative Law Judge ("ALJ"), as adopted by the Commission, there were 3,100 licensed dentists practicing within the State of Indiana in 1974 and 85–88 percent of those dentists belonged to the Indiana Dental Association ("IDA"). The IDA had an official "Manual on Group Funded Dental Care Programs" ("Manual") recommending the procedures that member dentists follow when treating patients covered by a group dental health care insurance plan. The Manual included a section entitled "I.D.A. Policy Regarding Group Dental Care," providing in pertinent part:

> "The method of authorization of dental health care under pre-payment plans should be limited to determining the eligibility of the patient and extent of liability of the plan and should prevent any interference with the dentist-patient relationship or with the judgment and decision of the dentist. The plan must not *require* the dentist to submit radiographs (x-rays) to a third party."

*Indiana Federation of Dentists,* 101 F.T.C. at 83 (emphasis original) (footnote omitted). The Manual also contained a form letter, entitled "To All My Patients," that provided in pertinent part:

> "Dental radiographs (x-rays) are a part of the dentist's legal health records. They are available for valid review by a qualified representative(s) of your insurance company in this office. Radiographs (x-rays) will not be submitted to third parties for their use in determination of benefits (e.g., least expensive adequate procedure, or optional course of treatment) because a determination of an adequate treatment plan can only be made after a knowledge of the following:
> A. Complete patient evaluation.
> B. Radiographs.
> C. Additional diagnostic procedures as required."

*Id.* at 83, 162–63. In addition to formulating these guidelines for member dentists, the IDA undertook a pledge project in 1973 to obtain written pledges from their members that they would not participate in group funded dental health care plans unless such plans were previously approved by the IDA. It was the IDA's position that "proper dental treatment is predicated on a diagnosis from many types of examination and not radiographs alone." *Id.* at 90. According to the IDA statistics, approximately 85 percent of the member dentists agreed to support the IDA policy.

The ALJ found that the "smaller insurers had generally gone along with the Indiana dentists' demands" to not *require* the submission of dental x-rays alone, but to review all diagnostic aids in determining a proper course of dental treatment. The ALJ further found that in July 1971, Aetna Life and Casualty Insurance Co. ("Aetna") insisted that Indiana dentists submit copies of dental x-rays for patients covered under Aetna's group dental plan with International Harvester and the United Auto Workers. Only a "small percentage of dentists" in the Allen County-Fort Wayne, Indiana area complied with Aetna's directive. By mid-1972, some 600 unpaid dental claims had accumulated and "[i]t was the consensus of Harvester, U.A.W. and Aetna that many of these 600 claims were probably meritorious and that they had to be taken care of in some way." *Id.* at 98, 172. Accordingly, Aetna selected and retained a dentist and "arranged for him to go to the office of each dentist concerned and work with the relevant x-rays and any other diagnostic aids in the dentist's files." *Id.* The ALJ found that "[t]his *modus operandi,* of course, came quite close to meeting IDA's unrealistic terms for insurer access to x-rays: 'qualified' personnel to come to the treating dentist's office." *Id.* Similarly, in October 1974, Connecticut General Life Insurance Company, ("Connecticut General") required that Indiana dentists submit copies of dental x-rays for patients covered under Connecticut General's group dental plan with General Motors and the United Auto Workers. The IDA member dentists objected to Connecticut General's policy and eventually the parties entered into a

procedures is in violation of the Indiana state law as established in 828 Ind.Adm.Code 1–4–3.

"gentlemen's agreement" whereby the IDA member dentists were merely asked to submit copies of a patient's dental x-rays but were not required to do so. Nonetheless, the ALJ found that by the spring of 1976, Connecticut General was receiving about 70 percent of its needed x-rays except in the Madison County-Anderson, Indiana area where only "about 2 to 4 out of 40 dentists—would ever submit x-rays when requested" by Connecticut General. *Id.* at 109, 172.

In August 1976, the petitioner, IFD, was formed as a separate and distinct association of Indiana dentists.[5] The IFD's constitution and by-laws provided that:

"The Indiana Federation shall represent, protect, maintain, and advance, through activities accomplished by relevant techniques which may lawfully be engaged in by a labor organization, the interests of the dentists within its jurisdiction. The objectives of this Federation shall include, but not be limited to the following:

a.) To represent dentists in all socioeconomic matters, negotiations and grievances with employers, third, and fourth parties or any group that is involved in financing or delivery of dental care. The ultimate purpose being to promote better patient care and to prevent abuses and correct inequities in the delivery of dental care to the public."

*Id.* at 74–75, 118, 171. As of February 1979, the IFD had 84 current and 8 former members concentrated within the localities of its three chapters: Anderson, Indiana and surrounding Madison County (46 members); Ft. Wayne, Indiana and surrounding Allen County (19 members); and Lafayette, Indiana and the surrounding counties of Carrol, Clinton, Tippecanoe, and White (27 members). Two of the dentists largely responsible for organizing the IFD, Dr. David McClure of Anderson, Indiana and Dr. Dan Rohn of Anderson, Indiana, had served on the Council of Dental Care Programs for the IDA formulating "policies, standards and principles for evaluating group-funded dental care programs," and in that capacity had co-chaired the IDA's pledge project.

In April 1977, the IFD member dentists adopted a "work rule" setting forth the IFD's policy that a proper dental diagnosis and treatment planning requires a review of all diagnostic and clinical aids, not simply a review of the patient's x-rays and insurance claim form. According to the IFD:

"Proper diagnosis and treatment planning predicates the doctor correlating all diagnostic aids, with a history and with all clinical findings. *No one facet of this process is now, or ever has been recognized by the profession as a substitute for the complete process.* To represent otherwise would subject the patient to substandard care.

The patient's dentist, therefore, has a moral and legal responsibility to not allow a determination of his patient's condition to be made for any purpose, without the benefit of a complete examination which takes into account all of the elements described."

*Id.* at 119, 129, 176 (emphasis added). Additionally, the IFD drafted a form letter for its members use when replying to a group dental health care insurer's request to submit copies of a patient's dental x-rays along with the patient's insurance claim form. The letter provided:

"Reference your request for x-rays for the above named patient. It is the policy of this office to provide all diagnostic aids to third parties on an in-office basis and with the consent of the patient. It is my belief that proper diagnosis and treatment planning predicates the doctor correlating all diagnostic aids with a history and all clinical findings. *No one facet of this process is now, or ever has been, recognized by the profession as a*

---

5. According to the ALJ's findings of fact, as adopted by the Commission, the IFD was organized as a labor union in an attempt to qualify for exemption from the Federal antitrust laws under the Clayton Act § 6, 15 U.S.C. § 17.

*substitute for the complete process.* To represent otherwise would subject the patient to substandard care.

If you will have your consultant contact my office to set up an appointment, I will furnish records and ask the patient to be present for an examination. If you do not feel that this is possible, the Indiana Federation of Dentists, of which I am a member, will help you, if possible, to provide a local consultant."

*Id.* at 122 (emphasis added).

The ALJ found that in January 1977, Connecticut General breached its "gentlemen's agreement" with the IDA and instituted a practice of insisting that Indiana dentists submit copies of a patient's dental x-rays along with the patient's insurance claim form. Dr. Rohn and other officers of the IFD immediately confronted the Connecticut General management to voice their disapproval over this change in policy. Following this meeting, Connecticut General "refrained from making any further requests for x-rays from Madison County (the Anderson area) for fear of a confrontation which would end all existing cooperation and snarl the payment of GM workers' claims." *Id.* at 123, 172. The ALJ further found that between April 1976 and January 1978, Metropolitan Life Insurance Co. of New York ("Metropolitan"), the group dental health insurer for the 450–500 employees of Brockway Glass in Madison County, directed Indiana dentists to submit copies of their patient's dental x-rays for benefit determination. The IFD member dentists refused to comply with this directive, and according to the ALJ, "Metropolitan simply declined to pay on claims when x-ray requests were refused." *Id.* at 123. In re-

sponse, the personnel manager of Brockway Glass and the local union president "made efforts to talk IFD's Dr. McClure into submitting x-rays but were unsuccessful." *Id.* at 123–24, 172–73.

In October 1978, the Commission issued a complaint against the IFD, charging it with a violation of the Federal Trade Commission Act § 5, 15 U.S.C. § 45(a)(1), which provides that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." [6] The complaint alleged that the IFD and its members had "engaged in acts, practices, and methods of competition to eliminate, prevent, or hinder competition among dentists with respect to cooperation by dentists with dental health care benefits programs containing predetermination and least expensive adequate course of treatment provisions." *Id.* at 59, 165–66. Specifically, the Commission alleged that the IFD was:

"Promulgating, adopting, publishing, and distributing to its members a purported 'work rule' that details certain uniform courses of conduct for dentists in their dealings with third party payers; and

Urging payers, purchasers and beneficiaries of dental health care benefits plans to eliminate provisions of such plans that [the IFD] finds unacceptable."

*Id.* at 61. The complaint further alleged that the IFD's practice had the following effects:

"A. Competition among dentists in Indiana has been hindered, restrained, foreclosed, and frustrated;

---

**6.** The record reveals that the IDA was named as a coconspirator in the Commission's complaint but not as a respondent because in November 1978, the Commission and the IDA entered into a consent decree that provides in pertinent part:

"*It is further ordered,* That respondents ... shall cease and desist from engaging in any activity, course of conduct, practice, or policy that in whole or in part:

A. Requests, urges, recommends or suggests that dentists, or has the purpose or effect of requiring or organizing dentists to, (1) refuse to submit radiographs or such other pre-

treatment and post-treatment reports, analyses and materials (except where post-treatment radiographs are not taken in the course of treatment and would expose the patient to unnecessary radiation) as third-party payers request for use in benefit determination or (2) refuse to deal in any particular way with any one or more third-party payers."

*Indiana Dental Association,* 93 F.T.C. 392, 398 (1979); 43 Fed.Reg. 53,768 (1978). *Accord Texas Dental Association,* 100 F.T.C. 536, 540 (1982).

B.　The cost of dental health care services in Indiana has been or may be stabilized, fixed, or otherwise tampered with;

C.　Consumers have been or may be deprived of the benefit of third-party payers' cost-containing measures, including lower or potentially lower costs for dental health care services and dental health care benefits insurance;

D.　Consumers have been or may be denied the benefits of a second dentist's opinion as to the adequacy of proposed dental treatment; and

E.　Consumers have been limited in their opportunity to select dentists who cooperate with dental health care benefits programs."

*Id.* at 62.

　Following an administrative hearing in October 1979, the ALJ issued a 132 page "Initial Decision" in March 1980. The ALJ found that "the members of IFD stand committed to a concerted refusal to furnish their patients' x-rays to dental health insurers.... [T]here is abundant evidence that IFD has actually carried out the IDA/IFD boycott scheme as planned." *Id.* at 121, 153.[7] According to the ALJ, this group boycott began with the IDA and "it was primarily consciousness of the antitrust risk inherent in IDA's organized boycott of Indiana's dental health care insurers—much magnified by the Supreme Court's 1975 ruling in *Goldfarb* [*v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975)]—which led to the organization ... of IFD ...." *Indiana Federation of Dentists*, 101 F.T.C. at 115. The ALJ ruled that the IFD "was formed in 1976 to join and continue a concerted refusal by many dentists in Indiana to submit radiographs (x-rays) to dental health insurers either automatically or on request." *Id.* at 153, 160. The ALJ concluded that the IFD's participation in this concerted refusal constituted a group boycott and was a *per se* violation of the Federal antitrust laws.[8] The ALJ added, in the

**7.** The ALJ made the following preliminary rulings:

(1) The IFD's alleged anticompetitive activity had a "substantial effect upon interstate commerce" and thus the Commission had jurisdiction over the complaint pursuant to 15 U.S.C. § 45(a)(1), *Indiana Federation of Dentists*, 101 F.T.C. at 77–78, 153 (on appeal the Commission affirmed this decision, *see* 101 F.T.C. at 161–64);

(2) The IFD was organized to "carry on business in substantial part for the profit of its members" and thus was a corporation for purposes of the Federal Trade Commission Act § 4, 15 U.S.C. § 44, subject to the Commission's jurisdiction, *Id.* at 75–76, 153, 160;

(3) The "IFD is not and never has been a labor union within the meaning of section 6 and 20 of the Clayton Act," 15 U.S.C. § 17, and thus did not satisfy the labor union exemption from the Federal antitrust laws, *Id.* at 76, 153, 160; and

(4) The McCarran-Ferguson Act, 15 U.S.C. §§ 1012, 1013(b), which exempts the practice of insurance from Federal antitrust laws did not apply in the instant case because the IFD did not engage in the business of insurance and even though the illegality concerned the insurance industry, the McCarran-Ferguson exemption does not apply to boycotts, *Id.*

The IFD does not appeal any of these decisions.

**8.** According to the Supreme Court in *National Soc. of Professional Engineers v. United States,* 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978), there are two categories of antitrust analysis:

"In the first category are agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality—they are 'illegal *per se.*' In the second category are agreements whose competitive effect can only be evaluated by analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed."

435 U.S. at 692, 98 S.Ct. at 1365. The *per se* analysis in Federal antitrust law applies to certain types of group boycotts. *See, e.g., Klor's v. Broadway-Hale Stores,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) (retailers combined with appliance manufacturers and distributors to boycott competing retailer); *Fashion Originators' Guild v. F.T.C.,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941) (organization of dress manufacturers and fabric designers boycotted retailers and manufacturers who dealt in copies of originals or refused to promise not to deal in such copies). According to the settled law in this circuit, "the common attribute of *per se* illegal group boycotts is 'a concerted attempt by a group of competitors at one level to protect itself from competition from non-group members who seek to compete at that level.'" *U.S. Trotting Ass'n v. Chicago Downs Ass'n, Inc.,* 665 F.2d 781, 788 (7th Cir.1981) (en banc) (quoting

alternative, that if such activity was not a *per se* violation, the record did not establish that the "effect on health safety ... outweigh[ed] the plainly anticompetitive and anti-consumer effects of the IDA/IFD group boycott of dental health care insurers," and thus the activity was also violative of the Federal antitrust laws under a rule of reason analysis. *Id.* at 153, 166.

Additionally, the IFD argued at the administrative hearing that its practice was "clearly articulated and affirmatively expressed as [Indiana] state policy," "actively supervised" by the state, and thus exempt from the Federal antitrust laws under the doctrine of state action. *See, e.g., California Liquor Dealers v. Midcal Aluminum,* 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980). According to the IFD, its refusal to submit copies of a patient's

dental x-rays to lay personnel employed by the group dental health care insurers was in compliance with Indiana state law which prohibits aiding and abetting the unlicensed practice of dentistry.[9] The ALJ equivocated on this issue, initially ruling that "there is probably no violation of the law against unlicensed practice of dentistry" when unlicensed lay personnel simply review claims for approval and have no authority to deny such claims in full or in part. *Indiana Federation of Dentists,* 101 F.T.C. at 137. The ALJ further ruled that even if the unlicensed lay personnel are engaged in the unlawful practice of dentistry, the Indiana law does not permit dentists "to organize a group boycott to help enforce the law." *Id.*[10]

The IFD appealed the ALJ's "Initial Decision" and in February 1983, the Commis-

---

*Smith v. Pro Football, Inc.,* 593 F.2d 1173, 1178 (D.C.Cir.1978)). More recently, this court has stated that group boycotts are illegal *per se* only if they are used to enforce agreements that are themselves illegal *per se. See Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101 at 1109 (7th Cir.1984); *Vogel v. American Society of Appraisers,* 744 F.2d 598 at 600 (7th Cir.1984). We note, however, that the foundation for this statement initially appeared in *Marrese v. Am. Academy of Orthopaedic Surgeons,* 706 F.2d 1488, 1493 (7th Cir.1983), a case that was subsequently vacated by this court, and later appeared in *Wilk v. American Medical Ass'n,* 719 F.2d 207, 221 (7th Cir.1983), a case that relied solely upon the vacated *Marrese* opinion.

Once *per se* illegality is established, there is a conclusive presumption that the conduct is unreasonable in violation of the Federal antitrust laws. *Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 344, 102 S.Ct. 2466, 2473, 73 L.Ed.2d 48 (1982); *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 50, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977); *Northern Pac. R. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). If, however, the defendants' concerted conduct is "not designed to drive out competitors, but to achieve some other goal," *U.S. Trotting Ass'n v. Chicago Downs Ass'n, Inc.,* 665 F.2d at 788, the court must engage in a rule of reason analysis. In this circuit "[i]t is necessary under the rule of reason to show anticompetitive effects, or actual harm to competition, to establish an antitrust violation ...." *Bunker Ramo Corp. v. United Business Forms, Inc.,* 713 F.2d 1272, 1283 (7th Cir.1983); *Havoco of America, Ltd. v. Shell Oil Co.,* 626 F.2d 549, 556 (7th Cir.1980).

9. Pursuant to Ind.Code § 25–14–1–23, the practice of dentistry includes:

"Any person ... who ... offers to diagnose or professes to diagnose or treats or professes to treat any of the lesions or diseases of the human oral cavity, teeth, gums, maxillary or mandibular structures ...."

10. The record reveals that the State of Indiana was granted leave to intervene in this lawsuit in July 1979 by the United States District Court for the Southern District of Indiana. The district court found that:

"The State of Indiana has and is, actively regulating both dentists and the practice of dentistry within the State.... Under the mandate of Indiana law, Indiana dentists are prohibited from submitting their dental x-rays to third party insurers who employ 'dental consultants,' who are not licensed to practice dentistry, to read or diagnois [sic] the x-rays." *Indiana Federation of Dentists,* 101 F.T.C. at 184. Thus, the district court ruled that "[t]he order proposed by the Secretary of the F.T.C. would infringe on the State's right to regulate the practice of dentistry within the State as reserved to the State under its police powers by the Tenth Amendment to the Constitution of the United States." *Id.* at 148, 184. At the administrative hearing, the IFD argued that under the doctrine of collateral estoppel, the district court's ruling precluded any ruling by the ALJ on the issue of state action. The ALJ rejected this argument, determining that the district court's findings of fact and conclusions of law on the merits of this case were not necessary for the judgment of leave to intervene, and thus the doctrine of collateral estoppel was inapplicable. *Id.* at 143–52.

sion issued a "Final Order." The Commission adopted the ALJ's findings of fact, agreed with the ALJ's determination that the IFD member dentists had engaged in a "group boycott," but rejected the ALJ's conclusion that such conduct was a *per se* violation of the Federal antitrust laws. The Commission reasoned that a *per se* analysis of this case was improper because the IFD member dentists' refusal to comply with the insurers' x-ray directive was not "wholly motivated by an anticompetitive purpose" nor was it "aimed principally at excluding competitors." *Id.* at 168.[11] Thus, the Commission analyzed the IFD member dentists' conduct under a rule of reason, finding that:

"the practical implementation of the [IFD] Work Rule was to refuse to cooperate with claims review programs which relied upon submission of x-rays. The effect of [the IFD member dentists'] conduct was to reduce competition among dentists to cooperate with dental reimbursement plans and, by doing so, to thwart the efforts of individual insurance companies to contain costs by offering coverage for only the least expensive adequate course of treatment."

*Id.* at 171–72. According to the Commission, the IFD member dentists' concerted refusal to comply with the insurers' directive to submit copies of a patient's dental x-rays along with the patient's claim form *"resulted in reducing or eliminating competition among dentists as to their policy of dealing with third-party payers." Id.* at 173 (emphasis added). The Commission further found that:

"In the absence of such concerted behavior, individual dentists would have been subject to the market forces of competition, creating incentives for them to treat patients and comply with the requests of patients' third-party insurers. By colluding, competitor dentists were freed to some extent from these market forces because they knew other participants in

11. *See supra* note 8.

12. The Commission ruled that its consideration of the IFD's state action defense was not barred

the boycott would also refuse to cooperate."

*Id.*

In response to the IFD's argument that its conduct did not harm competition because "there was not an absolute 'shut off' of x-rays to insurance companies," the Commission found that the IFD's policy of allowing insurers' to attend the dentist's office and view all diagnostic aids, including the patient's x-rays, was prohibitively expensive. The Commission surmised, without substantial evidentiary support in the record, that "even if the procedure were feasible at a higher cost, coercing parties into adopting such a procedure through collusion of competitors still distorts the competitive process." *Id.* The IFD further asserted that adherence to the IFD policy and accepted dental practice of examining all diagnostic aids before determining the proper course of dental treatment ensures patients of quality dental care and, in effect, promotes competition. According to the IFD:

"Competition is naturally promoted among dentists who treat only after total diagnosis, in that their total treatment plan will be more successful from both a preventative viewpoint and long term maintenance of oral health. Error is less likely, thus reducing needed corrective work. Proper diagnosis will promote proper services, and satisfied patients will patronize those dentists."

*Id.* at 176. The Commission found, however, that this procompetitive justification was not supported by the evidence adduced at the administrative hearing. The Commission further found that "Indiana law does not affirmatively express any policy in favor of collusion among dentists in order to prevent or influence the use of x-rays by insurance companies" and thus the doctrine of state action did not exempt the concerted conduct of IFD member dentists from the Federal antitrust laws.[12] Accordingly,

by the doctrine of collateral estoppel. According to the Commission, when the United States District Court for the Southern District of Indiana granted the State of Indiana leave to inter-

the Commission ruled that the "IFD's conduct constituted an unfair method of competition in violation of Section 5 of the FTC Act." *Id.* at 179. On appeal, the IFD contends that under a rule of reason analysis, the evidence presented at the administrative hearing failed to establish that the conduct of the IFD and its member dentists had an anticompetitive effect in a relevant market. In the alternative, the IFD contends that the state action doctrine exempts the IFD member dentists' conduct from the Federal antitrust laws.

## II

█ The issue squarely before this court is whether the collective refusal of the IFD member dentists to comply with the group dental health care insurers' directive to submit copies of a patient's dental x-rays along with the patient's insurance claim form violates the Federal Trade Commission Act § 5. In our review of the Commission's order we are guided by the Congressional language of 15 U.S.C. § 45(c) (1982), that "[t]he findings of the Commission as to the facts, if supported by evidence, shall be conclusive." According to the settled law in this circuit, the Commission "may draw reasonable inferences from the record." *Spiegel, Inc. v. F.T.C.,* 540 F.2d 287, 293 (7th Cir.1976) (citing *Consolo v. Federal Maritime Commission,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966)). The Commission's findings of fact "are to be accorded great deference and are to be upheld if supported by substantial evidence." [13] *Kaiser Aluminum & Chemical Corp. v. F.T.C.,* 652 F.2d 1324, 1329 (7th Cir.1981). *See also American Home Products Corp. v. F.T.C.,* 695 F.2d 681, 686 (3rd Cir.1982); *RSR Corp. v. F.T.C.,* 602 F.2d 1317, 1320 (9th Cir.1979), *cert. denied,* 445 U.S. 927, 100

S.Ct. 1313, 63 L.Ed.2d 760 (1980). Thus, our review is limited to a determination of whether "the Commission applied incorrect legal standards which prejudiced its findings against petitioners ... [and] whether the administrative decision is supported by substantial evidence in the hearing record before the examiner." *L.G. Balfour Company v. F.T.C.,* 442 F.2d 1, 7 (7th Cir.1971).

█ In the instant case, the evidence reveals that the members of the IFD collectively agreed upon and drafted a dental policy statement, entitled IFD "work rule," setting forth the IFD position that "[p]roper diagnosis and treatment planning predicates the doctor correlating all diagnostic aids, with a history and with all clinical findings." *Indiana Federation of Dentists,* 101 F.T.C. at 119, 129. This policy of quality and proper dental care comports with the Indiana dentists' code of professional conduct, as drafted by the Indiana Board of Dental Examiners, that the competent practice of dentistry requires "minimum standards of performance in diagnosis or treatment as measured against generally prevailing peer performance." 828 Ind.Adm.Code 1–1–15(b) (1984). The IFD policy also complies with the American Dental Association's position that "[t]he dentist's primary obligation of service to the public shall include the delivery of quality care, competently and timely, within the bounds of the clinical circumstances presented by the patient. Quality of care shall be a primary consideration of the dental practitioner." ADA Principles of Ethics and Code of Professional Conduct at 2 (1983). Moreover, the IFD policy of quality and proper dental care provides that the dentist "has a moral and legal responsibility to not allow a determination of his patient's condition to be made for any purpose, without the benefit of a complete

vene in this lawsuit, the court's findings of fact and conclusions of law concerning the State of Indiana's regulation of the dental profession, "were not essential to the judgment ordered" and thus the doctrine of collateral estoppel did not apply.

**13.** The Supreme Court defines substantial evidence as "such relevant evidence as a reason-

able mind might accept as adequate to support a conclusion." *Consolo v. Federal Maritime Commission,* 383 U.S. at 619–20, 86 S.Ct. at 1026 (quoting *Edison Co. v. Labor Board,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)). *See also Steadman v. SEC,* 450 U.S. 91, 99–100, 101 S.Ct. 999, 1006–1007, 67 L.Ed.2d 69 (1981).

examination which takes into account" all diagnostic aids, with a complete patient history and all clinical findings. *Indiana Federation of Dentists,* 101 F.T.C. at 119, 129, 176. Implicit within this IFD policy of quality and proper dental care is a determination that the review of x-rays *alone* is ineffective and insufficient when formulating a proper course of dental treatment.

According to the ALJ's findings of fact, as adopted by the Commission, an x-ray establishes *only:*

> "tooth decay, an abcess, bone loss around the teeth or pathology in the bone itself.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> [*E*]*ven a trained dentist can not determine the choice of restorative material just by looking at an x-ray, because that choice varies with how well the patient takes care of his teeth, which, in turn, affects how long the restorative material will last.... [Moreover] x-rays will not show the patient's mental condition, which is said to have considerable bearing on the treatment.*"

*Id.* at 129–30 (emphasis added). For these reasons, the ALJ found that *"the experts— on all sides—seemed to agree that an x-ray or other diagnostic aid alone is not enough for an accurate diagnosis." Id.* at 131 (emphasis added). Similarly, the American Dental Association provides that a proper "diagnosis and treatment plan cannot be made from radiographs alone. Benefits shall not be determined solely on the basis of radiographic evidence.... *Proper dental treatment is predicated on a diagnosis from many types of examination and not radiographs alone."* ADA Policies on Dental Care Programs 1974:653 at 34–35 (1984) (emphasis added). Thus, the IFD policy of quality dental care comports not only with the Indiana dental code and the American Dental Association code of professional conduct, but also with the American Dental Association's policy statement that a proper dental diagnosis involves many types of examinations and the ALJ's finding that an x-ray alone is not enough for an accurate dental diagnosis.

Indeed, just as a competent and qualified physician performs numerous tests for a recurring headache, to rule out a possible brain tumor, blood clot, migraine condition, dysfunction of the eyes, ears, or mouth, ruptured blood vessel, or drug reaction; a competent and qualified dentist, when prescribing a proper course of dental treatment, must examine and review the entire oral cavity, including the teeth, gum and mouth tissue, tongue, maxillary and mandibular bone structure, and loss of bone structure, along with a case history, x-rays, and all clinical findings. A thorough examination of this nature assures the patient of quality dental care and protects the dentist from future claims of negligence and possible dental malpractice. The evidence in this case establishes that the IFD member dentists collectively adhered to their policy of quality and proper dental care, refusing to comply with the group dental health care insurers' directive to submit copies of a patient's x-rays without the benefit of examining and reviewing all diagnostic aids, a case history, and all clinical findings. Instead, the dentists uniformly responded to the insurers' x-ray directive with a form letter, prepared by the IFD, that provided in pertinent part:

> "It is the policy of this office to provide all diagnostic aids to third parties on an in-office basis and with the consent of the patient.... If you will have your consultant contact my office to set up an appointment, I will furnish records and ask the patient to be present for an examination."

*Indiana Federation of Dentists,* 101 F.T.C. at 122. In light of the evidence presented at the administrative hearing, it is clear that the collective refusal of the IFD member dentists to comply with the insurers' x-ray directive resulted from the dentists' adherence to a legal, moral, and ethical policy of quality dental care that requires a complete examination of all diagnostic aids before formulating a proper course of dental treatment. Accordingly, the focus of our review is whether the conduct of the IFD member dentists in

adopting and collectively adhering to a policy that complies with the established, accepted, and approved standards of quality dental care constitutes a group boycott in violation of the Federal Trade Commission Act § 5.

## A. GROUP BOYCOTT

In *Phil Tolkan Datsun v. Greater Milwaukee, etc.*, 672 F.2d 1280 (7th Cir. 1982), this court set forth the general rule that:

"*'The classic "group boycott" is a concerted attempt by a group of competitors at one level to protect themselves from competition from non-group members who seek to compete at that level.* Typically, the boycotting group combines to deprive would-be competitors of a trade relationship which they need in order to enter (or survive in) the level wherein the group operates.' "

672 F.2d at 1284 (emphasis added) (quoting *Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1178 (D.C.Cir.1978)). *See also Kreuzer v. Am. Academy of Periodonotology*, 735 F.2d 1479, 1493 (D.C.Cir.1984); L. Sullivan, *Handbook on the Law of Antitrust* 230, 232 (1977). Contrary to the classic group boycott, the instant case does not involve a group of competitors banning together to protect themselves from non-group competitors. The record reveals that the IFD member dentists simply provide patients with quality dental care and pursuant to the terms of a collective bargaining agreement, the group dental health care insurers pay for the dentists' services. The record contains no evidence that the dentists compete with the insurers to attract patients, provide dental services, or prescribe dental treatment. Indeed, the ALJ found that "neither IFD nor any dentist member stands in the relation of competitor to any insurer...." *Indiana Federation of Dentists*, 101 F.T.C. at 124–25. In light of the non-competitive market structure, we agree with the Commission that the "conduct by the Indiana dentists involved a group decision to withhold [the submission of] x-rays from [insurance companies] *which were neither customers nor com-*

*petitors"* and thus, the IFD's conduct was "not aimed principally at excluding competitors." *Id.* at 168 (emphasis added). The refusal to comply with the insurers' x-ray directive is not an attempt by the IFD member dentists to protect themselves from competitors; it is an adherence to a legal, moral, and ethical policy of quality and proper dental care. Thus, due to the fact that the group dental health care insurers are not competitors of the IFD member dentists, we hold that the dentists' refusal to comply with the insurers' x-ray directive does not constitute a classic group boycott.

Despite an absence of competition between the IFD member dentists and the group dental health care insurers within the State of Indiana, the Supreme Court has concluded that "the term 'boycott' is not limited to concerted activity against ... competitors of members of the boycotting group." *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 552, 98 S.Ct. 2923, 2935, 57 L.Ed.2d 932 (1978) ("*St. Paul Fire & Marine*"). In *St. Paul Fire & Marine*, four medical malpractice insurers in the State of Rhode Island allegedly entered into an agreement whereby three insurers refused to deal with physicians and hospitals within the state, thereby compelling the physicians and hospitals to accept curtailed medical malpractice insurance from the fourth insurer, in alleged violation of the Sherman Act § 1. The insurers argued that their activities were immune from Sherman Act scrutiny under the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–1015, which excepts the practice of insurance from the Federal antitrust laws. The physicians and hospitals argued that the insurers' activity constituted a boycott and pursuant to the express language of the McCarren-Ferguson Act § 3, 15 U.S.C. § 1013(b), the Sherman Act remains applicable "to any agreement to boycott, coerce, or intimidate ...." According to the Supreme Court, "[t]*he generic concept of boycott refers to a method of pressuring a party with whom one has a dispute by withholding, or enlisting others to with-*

hold, patronage or services from the target." 438 U.S. at 541, 98 S.Ct. at 2930 (emphasis added). Based upon this broad definition of the term "boycott," the Court held that "[w]hatever other characterizations are possible, [the insurers'] conduct fairly may be viewed as 'an organized boycott'...." *Id.* at 544, 98 S.Ct. at 2931 (quoting *Fashion Guild v. F.T.C.*, 312 U.S. 457, 465, 61 S.Ct. 703, 706, 85 L.Ed. 949 (1941)).

This court has recognized that " '[t]he term "group boycott" ... is in reality a very broad label for divergent types of concerted activity.' " *Phil Tolkan Datsun v. Greater Milwaukee, etc.*, 672 F.2d at 1285 (quoting *Mackey v. National Football League*, 543 F.2d 606, 619 (8th Cir. 1976), *cert. dismissed*, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977)); *U.S. Trotting Ass'n v. Chicago Downs Ass'n, Inc.*, 665 F.2d at 788. The broad label of "group boycott" generally applies to conduct involving a concerted refusal to deal, commonly defined as "an agreement by two or more persons not to do business with other individuals, or to do business with them only on specified terms." II E. Kintner, *Federal Antitrust Law* § 10.27 at 155 (1980). The instant case concerns an agreement among the IFD member dentists to adhere to established, accepted, and approved standards of quality dental care by requiring that the group dental health care insurers examine and review all diagnostic and clinical aids before formulating a proper course of dental treatment. In furtherance of a legal, moral, and ethical policy that x-rays alone are ineffective and insufficient in formulating a proper course of dental treatment, the dentists refuse to submit copies of a patient's dental x-rays without the benefit of a complete diagnostic and clinical examination. Instead, the dentists expressly invite the insurers to visit their respective dental offices to review the patient's complete file, including reports compiled by dental specialists, the patient's case history, x-rays, all clinical findings, and examinations of the oral cavity, gum and mouth tissue, teeth, and bone structure.

The ALJ found that "most dentists have typically expressed their willingness to let insurers' 'qualified' experts come to their (the dentists') offices to look at x-rays and other diagnostic aids." *Indiana Federation of Dentists*, 101 F.T.C. at 125 n. 337. The ALJ further found that "smaller insurers had generally gone along with the Indiana dentists' demands" to not require the submission of dental x-rays alone, but to review and examine all diagnostic and clinical aids in determining a proper course of dental treatment. Moreover, the evidence reveals that in 1972, dentists in the Allen County-Fort Wayne, Indiana area continually refused to comply with a request by the Aetna Insurance Co. to submit copies of a patient's x-rays along with the patient's dental claim form. Aetna responded by hiring a licensed dentist and "arranged for him to go to the office of each dentist concerned and work with the relevant x-rays and any other diagnostic aids in the dentist's files." *Id.* at 98. In January 1974, Aetna settled upon a plan whereby a licensed dentist would travel from Aetna's Indianapolis office to Anderson, Indiana once a week to review x-rays and conduct in-mouth examinations at an estimated cost of $10 per patient.

In light of the fact that insurers have accepted the dentists' invitation to visit the dental office to examine and review all diagnostic and clinical aids, it is clear that the IFD member dentists did not engage in a *complete* refusal to deal with the group dental health care insurers. The dentists continued to treat all patients, including those covered by group dental health care plans, and thus continued to deal with the insurers on a regular basis. According to the record, the IFD member dentists simply agreed to require that group dental health care insurers do business on the dentists' terms, in compliance with established, accepted, and approved standards of quality dental care. Thus, the group boycott label in the instant case refers to the dentists' concerted effort to ensure quality dental care by requiring insurers to examine and review all diagnostic and clinical

aids before formulating a course of dental treatment for purposes of a benefit determination. The dentists' conduct was neither a classic "group boycott" intended to protect dentists from competitors nor a complete refusal to deal with insurers in their efforts to control spiraling dental costs. In effect, the IFD member dentists adopted and implemented a policy that comports with legal, ethical, and moral standards of quality dental care but conflicts with the practice of group dental health care insurers to formulate a course of dental treatment and to determine insurance benefits based solely upon an insurance claim form and copies of a patient's dental x-rays.

## B. RULE OF REASON

■ In reviewing the anticompetitive nature of the IFD member dentists' conduct, we initially note the Commission's observation that the "allegation of unfair methods of competition [against the IFD] is based on Sherman Act principles." *Id.* at 180 n. 24. Indeed, the respondent, FTC, admits in its brief that the Commission analyzed this case under the Sherman Act § 1, 15 U.S.C. § 1, and the Federal Trade Commission Act § 5, 15 U.S.C. § 45. *See also Id.* at 124, 153.[14] Accordingly, our review of the Commission's order is guided by the legal principles of Federal antitrust law established under both the Sherman Act and the Federal Trade Commission Act. Foremost among these legal principles is that "[t]he 'rule of reason' is the established standard of analysis for determining whether [a Federal] antitrust violation" has occurred. *Bunker Ramo Corp. v. United Business Forms, Inc.,* 713 F.2d 1272, 1283 (7th Cir. 1983). *See also Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 343, 102 S.Ct. 2466, 2472, 73 L.Ed.2d 48 (1982); *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). The rule of reason

"requires the factfinder to decide whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition." *Arizona v. Maricopa County Medical Society,* 457 U.S. at 343, 102 S.Ct. at 2473. *See also Monsanto Co. v. Spray-Rite Service Corp.,* —— U.S. ——, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984). According to the Supreme Court, "[o]nce experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it, it has applied a conclusive presumption that the restraint is unreasonable." *Arizona v. Maricopa County Medical Society,* 457 U.S. at 344, 102 S.Ct. at 344. *See also N.C.A.A. v. Bd. of Regents of Univ. of Okl.,* —— U.S. ——, 104 S.Ct. 2948, 2960, 82 L.Ed.2d 70 (1984); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* —— U.S. ——, 104 S.Ct. 1551, 1560 n. 25, 80 L.Ed.2d 2 (1984); *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. at 50 n. 16, 97 S.Ct. at 2557 n. 25. This principle of *per se* unreasonableness "avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries ...." *Northern Pac. R. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958); *Broadcast Music, Inc. v. CBS,* 441 U.S. 1, 8 n. 11, 99 S.Ct. 1551, 1558 n. 11, 60 L.Ed.2d 1 (1979); *Arizona v. Maricopa County Medical Society,* 457 U.S. at 344, 102 S.Ct. at 2473.

■■ The Supreme Court further provides that *"[p]er se* rules of illegality are appropriate only when they relate to conduct that is manifestly anticompetitive." *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 43 U.S. at 49–50, 97 S.Ct. at 2557. *See also Northern Pac. R. Co. v. United States,* 356 U.S. at 5, 78 S.Ct. at 518 (certain agreements or practices because of their pernicious effect on competition and lack of any redeeming virtue, are conclusively pre-

---

**14.** According to the Supreme Court in *F.T.C. v. Cement Institute,* 333 U.S. 683, 691–92, 68 S.Ct. 793, 798–99, 92 L.Ed. 1010 (1948), "soon after its creation the Commission began to interpret the prohibitions of § 5 as including those restraints of trade which also were outlawed by the Sherman Act, and ... this Court has consistently approved that interpretation of the Act." *See also* 11 von Kalinowski, *Antitrust Laws and Trade Regulation* § 121.01 at 121–22 (1983).

sumed to be *per se* unreasonable). Additionally, "the *per se* rule is not employed until after considerable experience with the type of challenged restraint." *Broadcast Music, Inc. v. CBS*, 441 U.S. at 19 n. 33, 99 S.Ct. at 1562 n. 33. *See also Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 265 n. 11 (7th Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982); *Havoco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549, 555 (7th Cir.1980). In accord with these legal principles the law in this circuit is well-settled that a *per se* analysis "should not be applied, and has never been applied by the Supreme Court, to concerted refusals that are not designed to drive out competitors but to achieve some other goal." *U.S. Trotting Ass'n v. Chicago Downs Ass'n, Inc.*, 665 F.2d t 788 (quoting *Smith v. Pro Football, Inc.*, 593 F.2d at 1180). *See also Kreuzer v. Am. Academy of Periodonotology*, 735 F.2d at 1491; P. Kissam, *Antitrust Law and Professional Behavior*, 62 Texas L.R. 1, 35–36 (1983). Based upon the Commission's finding that the conduct of the IFD member dentists is "not wholly motivated by an anticompetitive purpose, ... is not aimed principally at excluding competitors," *Indiana Federation of Dentists*, 101 F.T.C.at 168, and our previous analysis of the market structure between dentists and insurers within the State of Indiana, it is clear that the IFD member dentists are not attempting "to drive out competitors." Rather, the dentists are adhering to a legal, moral, and ethical policy of quality and proper dental care, requiring that the insurers examine and review all diagnostic aids before denying or approving a proper course of dental treatment. The record clearly reveals that the IFD member dentists' conduct is not manifestly anticompetitive, nor has it been the subject of prior Federal antitrust analysis, thus we agree with the Commission that the IFD member dentists' conduct in adhering to their policy of quality dental care must be analyzed under a rule of reason. *Cf. Kreuzer v. Am. Academy of Periodonotology*, 735 F.2d at 1492 (if the boycott amounts to a public service, sufficient questions of competitive effect are raised to allow release from *per se* treatment); *Wilk v. American Medical Ass'n*, 719 F.2d 207, 221 (7th Cir.1983), *cert. denied*, — U.S. ——, 104 S.Ct. 2398, 81 L.Ed.2d 355 (1984) (the anticompetitive effect of a boycott in the medical profession is too uncertain to be amenable to *per se* treatment).[15]

The Supreme Court precedent clearly provides that "the inquiry mandated by the Rule of Reason is whether the challenged agreement is one that promotes competition or one that suppresses competition." *National Soc. of Professional Engineers v. United States*, 435 U.S. at 691, 98 S.Ct. at 1365. According to the Court, under a rule of reason analysis:

"the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of in-

---

**15.** In *National Soc. of Professional Engineers v. United States*, the Supreme Court reasoned that professional services, including the medical profession, "by their nature ... may differ significantly from other business services, and, accordingly, the nature of the competition in such services may vary. Ethical norms may serve to regulate and promote this competition, and thus fall within the Rule of Reason." 435 U.S. at 696, 98 S.Ct. at 1367. We note, however, that the Court has applied a *per se* analysis in cases involving the medical profession; refusing "to tolerate manifestly anticompetitive conduct simply because the health care industry is involved." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 104 S.Ct. at 1565–66 n. 42. In the instant case, the conduct of the IFD member dentists is not manifestly anticompetitive. Moreover, our rule of reason analysis stems from the fact that the conduct of the IFD member dentists is not designed to drive out competitors but to promote a legal, moral, and ethical policy of quality and proper dental care. *See U.S. Trotting Ass'n v. Chicago Downs Ass'n, Inc.*, 665 F.2d at 787.

tent may help the court to interpret facts and to predict consequences."

*Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918). The rule of reason analysis "does not open the field of antitrust inquiry to any argument in favor of a challenged restraint that may fall within the realm of reason. Instead, it focuses directly on the challenged restraint's impact on competitive conditions." *National Soc. of Professional Engineers v. United States,* 435 U.S. at 688, 98 S.Ct. at 1363. Thus, "[u]nder the rule of reason, a showing of anticompetitive effect in the relevant market is an essential predicate of antitrust liability." *Phil Tolkan Datsun v. Greater Milwaukee, etc.,* 672 F.2d at 1287. *See also Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 103 S.Ct. at 1567. In this circuit "[i]t is ... well established that any rule of reason analysis requires a showing of anticompetitive market effect. To hold otherwise would ignore the very purpose of the [Federal] antitrust laws which were enacted for the protection of competition, not competitors." *U.S. Trotting Ass'n v. Chicago Downs Ass'n, Inc.,* 665 F.2d at 790 (quoting *Lektro-Vend Corp. v. Vendo Co.,* 660 F.2d at 268). *See also Wilk v. American Medical Ass'n,* 719 F.2d at 227 (under rule of reason analysis plaintiff must show that effect of conduct is to restrict competition rather than promote it); *Dos Santos v. Columbus-Cuneo-Cabrini Med. Center,* 684 F.2d 1346, 1352 (7th Cir.1982) (under rule of reason analysis plaintiff must show the challenged restraint has an adverse impact on competition in a relevant market).[16] Moreover, by requiring a showing of an anticompetitive effect in a relevant market we assure the consumer that the challenged activity actually harms competition, and thus we uphold the intended purpose of the Federal antitrust laws as a "consumer welfare prescription." *N.C.A.A. v. Bd. of Regents of Univ. of Okl.,* 104 S.Ct. at 2964 (quoting *Reiter v. Sonotone Corp.,* 442 U.S. 330, 343, 99 S.Ct. 2326, 2333, 60 L.Ed.2d 931 (1979)). *See also Products Liability Ins. v. Crum & Forster Ins.,* 682 F.2d 660, 663–64 (7th Cir.1982); R. Bork, *The Antitrust Paradox* 66 (1978); 21 Cong.Rec. 2455, 2456–63 (March 21, 1890) (statement of Sen. Sherman).

## C. ANTICOMPETITIVE EFFECT

 In light of the pertinent case law, we review the Commission's findings of a relevant market and the anticompetitive effect that the IFD member dentists' conduct had therein. We initially note that the Commission's analysis of the relevant market consisted of a single paragraph placed within a footnote of the "Final Order":

"As in any rule of reason case, attention must be paid to market definition in order to assess competitive effects. No elaborate analysis is required here, since the record shows that under IDA's leadership, the conspiracy spanned many, if not most, localities in Indiana. *Under the leadership of IFD, it continued to be strong in the local areas covered by that organization's three chapters.*"

*Indiana Federation of Dentists,* 101 F.T.C. at 173 n. 12 (emphasis added). Within this ambiguous relevant market (apparently including the IFD's chapters in Anderson, Ft. Wayne, and Lafayette, Indiana) the Commission found that the "IFD's concerted refusal to furnish x-rays to third-party payers substantially harmed competition among dentists by eliminating incentives for individual dentists to cooperate with cost-containment programs of third-party payers." *Id.* at 179. According to the Commission, this "concerted activity by

---

**16.** According to the Commission, "[t]o assess the legality of the IFD restrictions under a rule of reason analysis, we must examine their nature, purpose and effect on competition, including an assessment of any possible procompetitive impact." *Indiana Federation of Dentists,* 101 F.T.C. at 168–69. The Commission's statement is not a complete and accurate statement of the rule of reason analysis. An *examination* of the effect on competition is not sufficient, there must be an actual *showing* that the alleged proscribed conduct has an anticompetitive effect in a relevant market. *Phil Tolkan Datsun v. Greater Milwaukee, etc.,* 672 F.2d at 1287; *U.S. Trotting Ass'n v. Chicago Downs Ass'n, Inc.,* 665 F.2d at 790; *Lektro-Vend Corp. v. Vendo Co.,* 660 F.2d at 268.

competitors resulted in reducing or eliminating competition among dentists as to their policy of dealing with third-party payers." *Id.* at 173. The Commission further found that "[i]n the absence of such concerted behavior, individual dentists would have been subject to market forces of competition, creating incentives for them to treat patients and comply with the requests of patients' third-party insurers." *Id.* Thus, under a rule of reason analysis, the Commission found that within the area of the IFD's three separate chapters, the conduct of the 84 current and 8 former IFD member dentists had an anticompetitive effect *among dentists as to their policy of dealing with third party payers.*

It is important to note that the focus of the FTC's complaint and the basis of the Commission's finding was that the IFD member dentists' conduct harmed competition *among dentists in their policy of dealing with group dental health care insurers.* Neither the ALJ nor the Commission found that the dentists' conduct harmed competition among insurers, in their efforts to provide group dental health care coverage, nor among dentists, in their efforts to attract and treat patients covered by group dental health plans. Indeed, the Commission found that the "complaint did not clearly allege harm to competition in the dental insurance market, and conclusions about competitive harm to this market are unnecessary to our decision." *Id.* 101 F.T.C. at 174. Accordingly, the limited scope of our review is whether substantial evidence supports the Commission's finding that the dentists' adherence to a legal, moral, and ethical policy of quality and proper dental care and their refusal to comply with the insurers' x-ray directive, had an anticompetitive effect *among dentists in their policy of dealing with group dental health care insurers.*

The ALJ's "Initial Decision" and the Commission's "Final Order" are replete with references to the *clearly* and/or *plainly anticompetitive* conduct of the IFD member dentists in their policy of dealing with group dental health insurers. Implicit in this unsupported conclusory state-ment is a factual assumption that dentists in Anderson, Fort Wayne, and Lafayette, Indiana actually competed against one another in dealing with such insurers, and in complying with the insurers' directive to submit copies of a patient's dental x-rays along with the patient's claim form. The record is void of any finding that dentists within these three areas did, in fact, engage in any form of competition in their policy of dealing with insurers or in complying with the insurers' x-ray directive. The record contains no substantial evidence nor thorough analysis of the total number of dental patients within the relevant market; the percentage of dental patients covered by group dental health care plans within the relevant market; the availability and proximity of dentists from surrounding areas of Indiana; the fees charged those patients covered by group dental health care plans, as compared to the fees charged patients without such coverage, within the relevant market; the policy of non-IFD member dentists in dealing with group dental health care insurers within the relevant market; or the general policy of dental insurers throughout the State of Indiana in examining a proposed or completed course of dental treatment for purposes of benefit determination. Indeed, the ALJ found that *"the record here is substantially deficient in evidence* as to just what supplementation of x-rays for diagnoses is the usual practice of the dental health care insurers serving Indiana." *Id.* at 132 (emphasis added). Upon examination of the record, the parties' briefs, the ALJ's "Initial Decision," and the Commission's "Final Order" we discern no analysis of the factors which are necessary and essential to a finding that dentists in Anderson, Fort Wayne, and Lafayette, Indiana do, in fact, compete with one another in their policy of dealing with group dental health care insurers. The Commission apparently assumed, without substantial evidentiary support in the record, that because the IFD member dentists acted in concert rather than individually, competition had to exist among and between den-

tists in their policy of dealing with the insurers. An equally tenable argument, however, is that the IFD member dentists acted in concert because of their conviction to the legal, moral, and ethical policy of quality and proper dental care that requires a review of all diagnostic and clinical aids in formulating a proper course of dental treatment. *See, e.g., Kreuzer v. Am. Academy of Periodonotology,* 735 F.2d at 1494. Though the Commission's assumption of competition may be valid in the abstract, it is not supported by substantial evidence in the record.

Even if "reasonable inferences" could be drawn from the record to show that dentists in the relevant market did, in fact, compete in their policy of dealing with group dental health care insurers, the record is void of any substantial evidence to support the Commission's finding that the conduct of the IFD member dentists harmed this competition or had an anticompetitive effect. The Commission apparently reasoned that because the IFD member dentists had substantial market power within the Madison County-Anderson, Indiana area and the Allen County-Ft. Wayne, Indiana area, the dentists' collective adherence to their policy of quality and proper dental care altered these areas of the relevant market, allowing the dentists to refuse to comply with the insurers' x-ray directive without having to fear the potential loss of group dental health care patients. In support of this position, the Commission relied upon a letter written by the secretary of the Anderson IFD chapter, claiming that in September 1976, 95 percent of all practicing dentists in Madison County had joined the IFD. The Commission further relied upon a newsletter released by members of the Lafayette IFD chapter alleging that by September 1977, "all but a few dentists" in the four county Lafayette chapter were members of the IFD. Based upon these two separate letters, the Commission concluded that the IFD had substantial market power in two areas of the relevant market and that:

"[i]n the absence of ... concerted behavior, individual dentists would have been subject to market forces of competition, creating incentives for them to treat patients and comply with the requests of patients' third-party insurers. By colluding, competitor dentists were freed to some extent from these market forces because they knew other participants in the boycott would also refuse to cooperate."

*Indiana Federation of Dentists,* 101 F.T.C. at 173. Though the documentary evidence relied upon by the Commission to find market power may be sufficient to warrant an investigation into the practices of the IFD and its member dentists, the evidence falls far short of establishing that the dentists' conduct altered the relevant market to harm competition among dentists in their policy of dealing with group dental health care insurers.

According to the Commission, the harmful effect of the IFD member dentists' conduct in adhering to their legal, moral, and ethical policy of quality and proper dental care was to eliminate "incentives for individual dentists to cooperate with [the insurers'] cost-containment programs" and thus to "thwart the efforts of individual insurance companies to contain costs by offering coverage for only the least expensive adequate course of treatment." *Id.* at 171–72, 179. We note that neither the ALJ nor the Commission delineated the alleged incentives available to dentists for complying with the insurers' x-ray directive. Contrary to a finding of such incentives, the record clearly reveals that even when dentists refused to submit copies of a patient's x-rays along with the patient's claim form, group dental health care insurers continued to examine and process the patients' dental claim. We further note that neither the ALJ nor the Commission found that the submission of a patient's dental x-rays actually lowered the insurers' dental costs, or that the refusal to submit copies of a patient's x-rays actually increased dental costs. Indeed, the Commission expressly declined to consider these issues, claiming that "it is not for ... the Commission to judge the efficiency of the arrangements

selected by insurance companies to control costs." *Id.* at 175. *See also* D. Clanton, *FTC and the Professions*, 52 Antitrust L.J. 209, 218 n. 33 (1983). In light of this evidence, it is clear that the Commission applied a "limited rule of reason analysis ... but did not require elaborate proof of anticompetitive effect." D. Clanton, *FTC and the Professions*, 52 Antitrust L.J. at 218. As a result, the Commission's finding that the IFD member dentists' conduct had an *anticompetitive effect* among dentists in their policy of dealing with group dental health insurers is not supported by substantial evidence in the record.

A review of the evidence presented at the administrative hearing reveals that the IFD member dentists did not refuse to allow insurers access to a patient's dental x-rays. In furtherance of the established, accepted, and approved IFD policy of quality and proper dental care, the IFD member dentists allowed insurers to visit the dental office to review and examine the patient's x-rays along with all of the other diagnostic and clinical aids used in formulating a proper course of dental treatment. The evidence reveals that the IFD member dentists continued to treat patients, including those covered by group dental health care plans, and continued to make dental diagnoses that were subject to review and approval by group dental health care insurers. Thus, the IFD member dentists, did, in fact, compete among themselves and with non-IFD dentists in their billing of patients covered by group dental health care plans and in their policy of dealing with the insurers.

According to the Commission, the IFD member dentists offer to insurers to visit the dental office to review and examine all diagnostic and clinical aids did not reduce the harm to competition.

"While it is true that respondent was willing to allow *some* arrangement whereby x-rays could be examined by insurers—in particular, allowing insurers' consultants to make visits to the dentists' offices—the record is clear that this was prohibitively expensive .... Moreover, even if the procedure were feasible at a higher cost, coercing parties into adopting such a procedure through collusion of competitors still distorts the competitive process."

*Indiana Federation of Dentists*, 101 F.T.C. at 174–75, 125 n. 337.[17] The Commission's finding is tempered by evidence in the record that "smaller insurers had generally gone along with the Indiana dentists' demands" and that group dental health care insurers did, in fact, visit dental offices to examine and review all diagnostic and clinical aids, including x-rays. Moreover, as long as the IFD member dentists continued to treat patients covered by group dental health care plans and invite their insurers to the dental office to review and examine all diagnostic and clinical aids, the IFD member dentists continued to compete among themselves and with non-IFD dentists in their policy of dealing with group dental health insurers. Any expenses resulting from the adherence to the IFD policy of quality and proper dental care affected the insurers in their review of dental claims, not the dentists in their competition for patients covered by group dental health care plans or in their competition to deal with the patients' insurers. The record clearly reveals that the IFD member dentists continued to compete in their policy of dealing with group dental health insurers; the dentists simply required that the insurers abide by established, accepted, and approved standards of quality and proper dental care, examining and reviewing all diagnostic aids before formulating a proper course of dental treatment.

The record is void of any substantial evidence to support the Commission's finding that the IFD member dentists' refusal

---

**17.** The ALJ found that:

"[T]here is unchallenged testimony in this record to the effect that it is not economically feasible and in any event it would be a terrible waste of time to have insurers' professional dental consultants constantly travelling from office to office to talk to dentists (when available) and look at their x-rays."
*Indiana Federation of Dentists*, 101 F.T.C. at 84.

to comply with the insurers' x-ray directive, had an anticompetitive effect among dentists as to their policy of dealing with group dental health care insurers. *Accord Boddicker v. Arizona State Dental Ass'n,* 680 F.2d 66, 68 (9th Cir.), *cert. denied,* 459 U.S. 837, 103 S.Ct. 83, 74 L.Ed.2d 79 (1982) (no arguments presented to demonstrate an adverse effect on competition between dentists). In effect, the Commission's finding of a Federal antitrust violation, based upon the insufficient evidence presented in this case, is a rubber-stamp approval of the group dental health care insurers' practice to formulate a course of dental treatment based solely upon dental x-rays and an insurance claim form, in violation of established, accepted and approved standards of quality dental care. There is no doubt that judicial sanction of such a practice, under the guise of the Federal Trade Commission Act, runs contrary to public policy and the very purpose of the Federal antitrust laws as a consumer welfare prescription. Indeed, by preventing dentists from joining together to promote standards of quality dental care that comport with the American Dental Association's code of professional conduct and the Indiana dental code, the Commission, with absolutely no expertise or training in the highly advanced field of dentistry, unwisely regulates the dental profession and all of its specialties, including endodontia, exodontia, oral surgery, orthodontia, pedodontia, periodontia, and prosthodontia, to the detriment of consumers. The group dental health care insurers cannot be permitted to forsake standards of quality and proper dental care in an attempt to lower their dental costs, particularly in the instant case where there has been no finding that the review of dental x-rays alone, actually reduces dental costs. According to the evidence presented at the administrative hearing, the IFD member dentists adhered to the legal, moral, and ethical policy of quality dental care, requiring that insurers examine and review all diagnostic and clinical aids before formulating a proper course of dental treatment. The record contains no substantial evidence to support a finding that adherence to the IFD policy had an anticompetitive effect among dentists in their policy of dealing with group dental health care insurers. Thus, we hold that, under a rule of reason analysis, the evidence presented at the administrative hearing failed to establish that the conduct of the IFD and its member dentists had an anticompetitive effect in a relevant market, in violation of the Federal Trade Commission Act § 5.[18]

### III

Based upon the foregoing analysis, we vacate the Commission's "cease and desist" order.

FAIRCHILD, Senior Circuit Judge, concurring in result.

This case deals with a significant problem in the operation of group dental insurance in Indiana. The insurance companies have contracted with employers to pay dental bills incurred by employees. The insurer's obligation is limited, however, by the standard of "least expensive adequate course of treatment." An opportunity to examine an x-ray in connection with a claim for services already rendered or pre-authorization of a course of treatment aids the insurer in determining the amount of its obligation to pay, and serves the interests of both insurer and employer in keeping costs under control. Employee patients have an interest in prompt and full payment of their dental bills, as well as in the quality of care. Dentists have an interest in being paid for their service, as well as in freedom to exercise professional judgment in prescribing treatment.

There is little question that the Indiana Dental Association organized boycott of insurers' requests for x-rays had a significant economic impact on the functioning of

---

**18.** In light of this court's holding that under a rule of reason analysis the evidence presented at the administrative hearing failed to establish that the conduct of the IFD and its member dentists had an anticompetitive effect in a relevant market, we need not address the issue of state action.

group dental plans within Indiana. In 1974 IDA's membership included 85 to 88 percent of licensed dentists in Indiana. IDA's recommendation to its members to refuse to submit x-rays began as early as 1972 and achieved widespread compliance particularly in those counties where IFD would later form chapters. IDA's boycott forced group insurers to withdraw requests for the mailing of x-rays or face growing backlogs in patient claims. The experience of Aetna Insurance Company, provides an example. Aetna contracted to provide dental coverage to International Harvester employees in 23 states and several foreign countries. The Commission found that:

> Only in Indiana did Aetna experience any difficulty in obtaining x-rays for review of dental treatments. Within one year, there was a backlog of approximately 600 unpaid claims, because of Aetna's inability to verify the maximum allowable benefits. In a one-time effort to eliminate this backlog, the company's dental consultant visited the offices of all the dentists who had refused to submit x-rays and reviewed the claims with them, also urging them to submit x-rays in the future. There were two general reactions to his plea: "one, dentists who said despite the fact that you seem fair, I will not send x-rays to you; and others who said I would like to, but I don't dare to." In January, 1974, Aetna's consultants began doing in-mouth examinations of claimants in its Ft. Wayne office; they continued this practice until the end of November, 1978. In that period, the company conducted 4,700 exams at an estimated cost of ten dollars each. (Transcript references omitted.)

By 1976 some leaders of the IDA inspired boycott became concerned that antitrust entanglements would begin to hinder IDA's already prolonged efforts to force group dental insurers to cease requesting submission of x-rays. These individuals decided to form a "dentist union" that they hoped would give dentists "more muscle" in negotiations with insurance carriers and be immune from antitrust liability. In August 1976 IFD was formed with members in at least six Indiana counties.

After formation, IFD actively encouraged its members to continue the IDA boycott. The record shows that companies operating dental insurance plans in counties with high IFD membership continued to face substantial resistance to requests for x-rays as late as January 1977.

Even viewing the IFD group independently of the IDA background, the size of IFD membership in a number of Indiana counties gave IFD the power to frustrate to a significant extent the insurers' need to review x-rays in those counties without going to exorbitant expense.

The substantial problem posed to the insurers by the concerted refusal to supply x-rays is clear. The difficult questions arise from the application of antitrust doctrine.

The underlying issue is the fairness of the practice of refusal, principally as it impacts insurers, but also as it affects employers and employee-patients. The complaint alleged that the concerted refusals were unfair acts or practices. The FTC acknowledged that the record contained some evidence of consumer injury, but noted that neither the parties nor the ALJ had analyzed the issue of unfairness liability and declined to decide it. The FTC also concluded under the unfair methods of competition allegation a *per se* analysis is inappropriate, and that it must, under the rule of reason, examine the nature, purpose, and effect on competition of the concerted refusals.

Also acknowledging an argument by complaint counsel that the dentists' concerted action may have caused reduced competition among insurers, the FTC declined to make that finding. The FTC did find that the concerted refusals substantially limited competition among dentists. Thus the inquiry must be focused on competition among dentists, and whether concerted refusal to furnish x-rays to insurers curtails such competition.

**1146**

I join in the result reached by the court, vacating the FTC order, because I conclude that the FTC analysis of the effect of the concerted refusal on competition among dentists is deficient.

Conceivably a dentist's willingness or unwillingness to supply x-rays to an insurer may be significant to an employee in choosing his dentist. Assuming that a prospective patient is aware of the practice of particular dentists in refusing or supplying x-rays, and the significance that refusal or cooperation may have to the patient's interest, he may choose one dentist over another. Presumably a patient would consider cooperation desirable because the bill would be paid more promptly. The IFD, however, might argue that refusal is an advantage to a patient because a dentist who decides to refuse puts a value on preserving his independent judgment of the patient's needs.

Pretty clearly, no evidence was developed on the validity of an assumption that a dentist's policy of refusal or cooperation has any significance in competition among dentists, and the FTC decision fails to analyze the proposition. It may well be that evidence could be produced to support a finding that this policy is really an element of competition among dentists and that a concerted policy of refusal does work a real injury to competition. But this analysis has not been made.

This deficiency is the reason I join in the court's result. There is much in the opinion in which I do not join, particularly in the repeated assertion that the concerted refusal resulted from a legal, moral and ethical policy of quality dental care and complied with established, accepted, and approved standards of such care. The relevance of these assertions is not clear. Insofar as they imply a finding that legal, moral and ethical considerations and approved standards were the sole cause of the concerted policy, they are in conflict with a clearly and adequately supported finding of the FTC of an economic motive.

The FTC said:

Moreover, it is clear that the concern of IDA's members over possible interference in the doctor-patient relationship was not limited to the effect such interference might have on patient welfare. It also extended to issues of professional pride and the economic well-being of Indiana dentists. Dr. McClure, who later became the first president of IFD, said in a speech to the association's Council on Dental Care Programs in 1974: "We are fighting an *economic war* where the very survival of our profession is at stake. * * * The name of the game is money. The government and labor are determined to reduce the cost of the dental health dollar at the expense of the dentist. There is no way a dental service can be rendered cheaper when the third party has to have its share of the dollar." * * *

With the formation of IFD, the economic motive became more explicit.