**HAVOCO OF AMERICA, LTD.,**
**Plaintiff-Appellant,**

v.

**SHELL OIL COMPANY,**
**Defendant-Appellee.**

**No. 79–1261.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 27, 1979.

Decided July 10, 1980.

Rehearing and Rehearing En Banc
Denied Sept. 3, 1980.

Paul E. Freehling, John B. Lashbrook, Chicago, Ill., for plaintiff-appellant.

Joan M. Hall, Chicago, Ill., for defendant-appellee.

Before CASTLE, Senior Circuit Judge, and PELL and WOOD, Circuit Judges.

PELL, Circuit Judge.

Havoco of America, Ltd. (Havoco) brought this treble damage action against the Shell Oil Company (Shell) pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, alleging that Shell conspired to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The sole question presented by this appeal is whether the district court erred in dismissing the complaint for failure to state a claim upon which relief can be granted.

## I.

The factual allegations in the complaint, which we assume to be true for purposes of considering a dismissal for failure to state a claim, are as follows. Havoco, both directly and through its subsidiaries, engages in a variety of business activities relating to products which are sources of energy, including coal and oil.

In February 1975, Havoco entered into a contract with the Tennessee Valley Authority (TVA), a major purchaser of coal, to provide coal to TVA for a period from February 1975 through February 1985. Havoco itself does not produce coal, but rather functions as an independent marketer. The contract therefore provided that the coal was to be obtained from, among others, R&F Coal, a wholly owned subsidiary of Seaway Coal. The Havoco-TVA contract permitted either party to reopen base price negotiations six months after execution. TVA exercised that option in August of 1975 and negotiations continued for several months. In early 1976, R&F Coal urged Havoco to assign its TVA contract to R&F, so that that company, as the producer, could negotiate directly with TVA. As consideration for the assignment, R&F proposed to pay Havoco either a lump sum, or a commission on each ton of coal sold by R&F to TVA through the original contract term, whether pursuant to the Havoco-TVA contract or any subsequent contract R&F might negotiate independently.

In February 1976, Havoco and R&F orally agreed to the assignment on the commission basis, an agreement which was reduced to writing the following month.[1] In April 1977, TVA and R&F entered into a short term contract for the purchase and sale of coal, and two months later a second contract was executed, obligating R&F to sell coal to TVA over a seventeen year period.

Notwithstanding R&F's contractual agreement to pay commissions to Havoco, it has consistently refused to do so, despite the fact that its sales to date have been substantial. Arriving finally at the involvement of the defendant in this action, it is Havoco's contention that this breach of contract was in fact induced by Shell, which, after extensive negotiations, in July 1977 acquired all of the stock of R&F's parent corporation, Seaway Coal.

Havoco thereafter commenced this litigation. The original complaint named several defendants, including Shell, R&F and Seaway,[2] and alleged, in addition to violations of Section 1 of the Sherman Act, several state law causes of action including breach of contract, fraudulent misrepresentation, deceit, unfair competition, breach of fiduciary duty, tortious interference with contract relations, and violations of the Illinois Antitrust Act, Ill.Rev.Stat. ch. 38, § 60–3(2) and the Illinois Deceptive Business Practices Act, *id.* at ch. 121½, § 262. The district court dismissed the federal antitrust count for failure to state a claim, and, because there was a lack of diversity between Havoco and Shell, also dismissed the pendent state claims following the guidelines set forth in *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) and *Owen Equipment & Erection Company v. Kroger*, 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978).

1. The contract provided as follows:
 *R&F/TVA Sales*: In the event that after the date of this agreement, and continuing through and including February 28, 1985, R&F shall sell or deliver coal to TVA, whether such sale shall be made directly to TVA by R&F or through any other agency or intermediary, under the [1975 Havoco-TVA contract], or any other subsequent agreement, then in that event, R&F shall pay to Havoco [0.35%] of the net selling price per ton to TVA for the first 150,000 tons per month, and [0.7%] per ton for each ton in excess of 150,000 tons per month, based upon net selling price of R&F, f. o. b. Bellaire, Ohio. . .
 The payments referred to herein shall be made promptly upon receipt of payment by R&F for such coal delivered.
 The contract was negotiated not only as consideration for the assignment, but also in settlement of a lawsuit between R&F and Havoco which arose out of an earlier contract between the parties.

2. The complaint also named Seaway River Terminal, Inc., which is engaged in the business of operating barge loading facilities for the transport of coal and is also a subsidiary of Seaway Coal, and Elmer Hill and Hilco, Inc., the latter of which is also engaged in the marketing of coal to TVA. Between April 1975 and March 1976, Hill who now serves as president of Hilco, served as an officer and director of Havoco. It was Havoco's contention that Hill conspired with R&F during this time period to induce Havoco's agreement to the assignment, knowing that R&F did not intend to make the commission payments.

Havoco then filed an amended complaint naming Shell alone as a defendant and alleging only a violation of Section 1 of the Sherman Act. It pursued its state law claims against the remaining original defendants in a diversity action in the Northern District of Illinois. *Havoco of America, Ltd. v. R&F Coal Co.*, No. 79 C 75 (N.D.Ill.) (dismissed pursuant to stipulation, Jan. 3, 1980). This appeal resulted from the district court's dismissal of the amended complaint.

## II.

■ Before analyzing Havoco's substantive claims, we first examine briefly the appropriate role of summary judgment procedures in antitrust litigation. It is well settled that a complaint should not be dismissed for failure to state a claim unless it is abundantly clear that the plaintiff could prove no set of facts which would entitle it to relief. *Hospital Building Co. v. Rex Hospital Trustees*, 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976); *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). As the Supreme Court has observed, "[S]ummary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962).

■ These concerns are further entitled to special weight in cases involving, as here, a private treble damage action brought pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15. This follows from the fact that that section embodies a Congressional intent to encourage private enforcement of the antitrust laws through the provision of treble damage remedies to those plaintiffs with meritorious claims who are willing to undertake the too often lengthy and costly litigation process. In accordance with this intent, we have generally recognized a preference for liberal construction of pleadings in private treble damage actions. *See, e. g.,*

*Austin v. House of Vision, Inc.*, 385 F.2d 171 (7th Cir. 1967).

■ It does not necessarily follow, however, that the above principles require the trial of cases where the cause of action alleged is substantively deficient. A contrary view would be tantamount to excepting antitrust litigation from the provisions of Rules 12(b)(6) and 56 of the Federal Rules of Civil Procedure. We rather think that the import of *Poller* and its progeny is simply that where some claim under the antitrust laws has been stated, the factual, subjective questions of intent and purpose are properly resolved only after discovery and trial. Here, however, the question presented relates, as it should on a Rule 12(b)(6) motion, to the purely legal issue of whether, viewing all of Havoco's allegations, including those of purpose and intent, as true, Havoco has successfully pleaded a contract, combination, or conspiracy in restraint of trade, within the meaning of the Sherman Act. If the pleadings allege such a violation, the action must be remanded for trial, however unlikely it may be that Havoco can prove its contentions. Conversely, if the allegations of the complaint fail to establish the requisite elements of the cause of action, our requiring costly and time consuming discovery and trial work would represent an abdication of our judicial responsibility. *See Lupia v. Stella D'Oro Biscuit Co., Inc.*, 586 F.2d 1163, 1166–67 (7th Cir. 1978), *cert. denied*, 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979).

### A. Contract, Combination, or Conspiracy

The first question raised by the unusual facts of this case is whether the "contract, combination or conspiracy" element of the cause of action can be established with respect to Shell, which did not acquire R&F's parent corporation until *after* a substantial part of the actions challenged here had occurred. Havoco does not attack the acquisition of Seaway itself as violative of the antimonopoly prohibitions contained in Sec-

tion 2 of the Act.[3] Rather it argues that by virtue of the acquisition, Shell entered the ongoing conspiracy between R&F and other defendants named in the original complaint, and did so not only with knowledge of the alleged anticompetitive conduct of the acquired co-conspirators, but also with a purpose to continue the conduct by inducing R&F to breach its contract to pay commissions.

 It is well recognized that a co-conspirator who joins a conspiracy with knowledge of what has gone on before and with an intent to pursue the same objectives may, in the antitrust context, be charged with the preceding acts of its co-conspirators. *See, e. g., Industrial Building Materials, Inc. v. Interchemical Corp.,* 437 F.2d 1336, 1343 (9th Cir. 1970). It is also an acknowledged principle that a corporation may "conspire" within the meaning of the Sherman Act with its subsidiaries, provided that the organizations are held out as distinct legal entities. *See United States v. Citizens & Southern National Bank,* 422 U.S. 86, 116, 95 S.Ct. 2099, 2116, 45 L.Ed.2d 41 (1975); *Timken Roller Bearing Co. v. United States,* 341 U.S. 593, 598, 71 S.Ct. 971, 974, 95 L.Ed. 1199 (1951). We therefore think that Havoco's allegations are sufficient as to this element.

### B. *Restraint of Trade*

 Interpretation and application of Section 1 of the Sherman Act, which paucil-oquently prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations" is rarely free from difficulty. This follows from the fact that, as the Supreme Court has observed, the statute cannot be read to mean what it says without invalidating the entire body of commercial contract law. *National Society of Professional Engineers v. United States,* 435

U.S. 679, 687–88, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). It is for this reason that the Act, in accordance with both its legislative history and common law antecedents, has been tempered by the Rule of Reason. *See Standard Oil Co. v. United States,* 221 U.S. 1, 60, 31 S.Ct. 502, 515, 55 L.Ed. 619 (1911). The Rule does not exempt restraints which may be argued to be reasonable or expedient, but rather focuses on the reasonableness of the effect of the challenged restraint on competition. *National Society of Professional Engineers v. United States, supra,* 435 U.S. at 688, 98 S.Ct. at 1363. An examination of the legality of any conduct alleged to be anticompetitive therefore necessitates a determination as to what the consequences of the conduct have been in the affected market.

 Contrary to Havoco's assertion, the absence of a sufficient allegation of anticompetitive effects in a Sherman Act complaint is fatal to the existence of the cause of action. It was a desire to eliminate the *public injury* of diminished competition which impelled Congress to enact the antitrust laws and to provide a treble damage recovery to those private parties willing to bring enforcement actions. *See, e. g., Apex Hosiery Co. v. Leader,* 310 U.S. 469, 500–01, 60 S.Ct. 982, 996, 84 L.Ed. 1311 (1940); *Magnus Petroleum Co., Inc. v. Skelly Oil Co.,* 599 F.2d 196, 204 (7th Cir. 1979), *cert. denied,* 444 U.S. 916, 100 S.Ct. 231, 62 L.Ed.2d 171; *Stifel, Nicolaus & Co. v. Dain, Kalman & Quail, Inc.,* 578 F.2d 1256, 1259 (8th Cir. 1978); *Northwest Power Products, Inc. v. Omark Industries, Inc.,* 576 F.2d 83 (5th Cir. 1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979); *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,* 508 F.2d 547 (1st Cir. 1974), *cert. denied,* 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975); *Kinnear-Weed Corp. v. Humble Oil & Refining Co.,* 214 F.2d 891,

---

**3.** Section 2 of the Sherman Act may be employed to challenge a merger or acquisition which will create a vertical integration that will foreclose a share of the market otherwise open to competitors, if the net effect of the integration is to provide the economic power or lever-

age within the market for the creation of the monopoly. *See Brown Shoe Co. v. United States,* 370 U.S. 294, 328, 82 S.Ct. 1502, 1525, 8 L.Ed.2d 510 (1962). *See generally* II E. Kintner, *Federal Antitrust Law* § 12.16 (1980).

893–94 (5th Cir. 1954), *cert. denied*, 348 U.S. 912, 75 S.Ct. 292, 99 L.Ed. 715 (1955).

▮ The only exception to the requirement of an allegation of anticompetitive effects in a Section 1 Sherman Act complaint occurs in the narrow category of *per se* cases. This follows not from the fact that anticompetitive effects need not exist to establish the elements of a *per se* offense, but rather from the fact that the type of conduct complained of in a *per se* action is so destructive of free competition that deleterious effects will be conclusively presumed. Examples of such *per se* offenses include price fixing agreements, *see United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), group boycotts, *see Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), market allocation, *see United States v. Topco Associates, Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972), and certain types of tying arrangements, *see International Salt Co. v. United States*, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947).

▮ Havoco, confusingly, first concedes that acts of unfair competition which are alleged to be violative of the Sherman Act must be evaluated under the Rule of Reason and not the *per se* doctrine. It nevertheless contends that courts are still "wrestling" with the question of whether harmful effects on competition are an essential element of the offense. This, as noted above, is simply not a correct statement of the law. Havoco then notes that an allegation of anticompetitive effects is "definitely not required for a claim based on a *per se* violation . . .", and argues, therefore, that "specific pleading of anticompetitive effect is not necessary to state a Sherman Act claim." We think that this line of reasoning represents either an attempt by "back-door" entry to assert an argument that the *per se* doctrine be applied to acts of unfair competition, or is indicative of a fundamental misconception of the elements of a Sherman Act offense. Not surprisingly, most of the cases cited by Havoco deal principally with the question of the applica-

bility of the *per se* doctrine to conduct similar to that complained of here. Because we have not yet addressed the question in this circuit of whether the *per se* doctrine should be applied to acts of unfair competition and because there appears in any event to be some perplexity as to the proper method of analysis of a claim such as Havoco's, we will examine the sufficiency of the allegations under both the *per se* approach and the Rule of Reason.

▮ A particular course of conduct will generally be termed a *per se* violation of the Act only after courts have had considerable experience with the type of conduct challenged and application of the Rule of Reason has inevitably resulted in a finding of anticompetitive effects. *See Northwest Power Products, Inc. v. Omark Industries, supra*, 576 F.2d at 88. In matters involving unfair trade practices and business torts, this has not been the case, particularly as to the more recent and, in our view, the better authority.

Some earlier decisions, notably *Albert Pick-Barth v. Mitchell Woodbury Corp.*, 57 F.2d 96 (1st Cir. 1932), *cert. denied*, 286 U.S. 552, 52 S.Ct. 503, 76 L.Ed. 1288, admittedly support a contrary view. In that case the Court of Appeals for the First Circuit held that a conspiracy to eliminate a competitor by unfair means violated the Sherman Act. Subsequently, the same court in *Atlantic Heel Co. v. Allied Heel Co.*, 284 F.2d 879 (1st Cir. 1960), characterized similar, albeit more extreme methods of unfair competition, as a *per se* violation of the Act. A *Pick-Barth* type cause of action was also recognized by the Tenth Circuit in *Perryton Wholesale, Inc. v. Pioneer Distributing Co.*, 353 F.2d 618 (10th Cir. 1965), *cert. denied*, 383 U.S. 945, 86 S.Ct. 1202, 16 L.Ed.2d 208 (1966), although that opinion did not employ *per se* terminology. To our awareness, only one other case, *C. Albert Sauter Co. v. Richard S. Sauter Co.*, 368 F.Supp. 501 (E.D. Pa.1973), has expressly applied a *per se* analysis, and it has been criticized. *See* Note, 42 Fordham L.Rev. 909 (1973–1974).

We do not think that the reasoning of the *Pick-Barth* line of decisions is persuasive

and we therefore decline to adopt it in this circuit. As this court noted last year in *Magnus Petroleum Co., Inc. v. Skelly Oil Co.*, 599 F.2d 196 (7th Cir. 1979), the Supreme Court's decision in *Continental TV, Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), first "evinces judicial reluctance to extend *per se* rules . . .," 599 F.2d at 204. Secondly, the *Pick-Barth* line of cases has been recently rejected by every court considering the issue, and has, notably, been greatly limited, if not overruled, even in the First Circuit. In *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 508 F.2d 547 (1st Cir. 1974), *cert. denied*, 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975), the court expressly disapproved the use of a *per se* analysis in such cases, *id.* at 560, and held unfair competition actionable under the Sherman Act only where a defendant with significant market power utilized unfair competition to eliminate or cripple its competitors as organizations, thereby increasing its own market dominance and affecting competition as required by the Rule of Reason.

Similarly, other courts of appeals have also held unfair competition to be within the ambit of the antitrust laws only under a Rule of Reason analysis. *See Stifel, Nicolaus & Co., Inc. v. Dain, Kalman & Quail, Inc.*, 578 F.2d 1256 (8th Cir. 1978); *Northwest Power Products, Inc. v. Omark Industries*, 576 F.2d 83 (5th Cir. 1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979). Judge Roney's scholarly opinion for the Fifth Circuit in the latter case is particularly instructive:

> Critics of *Pick-Barth* make several telling points. The first is that the definition of "unfair means" is so vague that the *Pick-Barth* cases fail to draw the bright line of illegality which is essential if a *per se* rule is to achieve its purpose as a guide to business planning. There is no federal law of unfair competition. *Pick-Barth* and *Perryton* rely on dictum concerning unfair competition in the pre-*Erie* case, *Hitchman Coal & Coke Co. v. Mitchell*, 245 U.S. 229, 259 [38 S.Ct. 65, 62 L.Ed. 260] (1917).

> \*　　\*　　\*　　\*　　\*　　\*

> On a more fundamental level, the *Pick-Barth* doctrine fails to perceive that the purposes of antitrust law and unfair competition law generally conflict. The thrust of antitrust law is to prevent restraints on competition. Unfair competition is still competition and the purpose of the law of unfair competition is to impose restraints on that competition. The law of unfair competition tends to protect a business in the monopoly over [its customers] while the general purpose of the antitrust laws is to promote competition by freeing from monopoly a firm's . . . markets for its products.

576 F.2d at 88.

Because Shell's actions do not amount to a *per se* violation of the Act, the next question is therefore whether Havoco's allegations state a claim under the Rule of Reason. The appropriate analysis under the Rule of Reason requires not only that the plaintiff allege and prove anticompetitive effects, but additionally, as with all antitrust claims, that the injury complained of be of a type that the antitrust laws were designed to guard against, *see Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977), and further that the antitrust violation be the direct cause of plaintiff's injury. *See Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977); *Lupia v. Stella D'Oro Biscuit Co., Inc.*, 586 F.2d 1163, 1168 (7th Cir. 1978), *cert. denied*, 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979). With respect to the latter two elements of the cause of action, we think the allegations are sufficient. Every authority which has rejected the applicability of the *per se* doctrine to acts of unfair competition has nevertheless recognized that such conduct may be actionable under the antitrust laws if the effect is to restrain free competition. An injury which results from unfair competition may, in short, be an antitrust injury if the other elements of the offense are present. Similarly, there is no issue here as to the requisite nexus between the

actions of Shell and its subsidiaries and the injury to Havoco. The injury was direct.

As to the primary element of the offense, however, we agree with the district court, albeit for different reasons,[4] that Havoco's allegations as to anticompetitive effect, even when judged by the placable standards applied in considering a motion pursuant to Rule 12(b)(6), were deficient.[5]

 The classic formulation of the Rule of Reason test of anticompetitive effects was stated by Justice Brandeis in *Chicago Board of Trade v. United States*, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1948):

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because

---

4. The district court observed in its order dismissing the original complaint that "[i]t appears from the facts as pleaded that there has simply been an elimination of a middle-man between a manufacturer and a buyer." We think, however, that the elimination of an independent marketer or "middleman" may well run afoul of the Sherman Act where, for example, the effect will be to eliminate a marketer of competing brands in favor of an exclusive sales agent of the manufacturer or producer, thereby affecting interbrand competition. For the reasons discussed in text, *infra*, we do not believe this to be such a case.

5. Because our decision rests on an analysis of the pleading, we set out in full the pertinent allegations of the amended complaint:

23. Commencing in the Spring or Summer of 1977, defendant Shell Oil Co. entered into unlawful contracts, and engaged in an unlawful combination and conspiracy, with co-conspirators R&F Coal, Seaway Coal, Seaway Terminal, Hilco, Inc., Hill, and others. The unlawful contracts, combination, and conspiracy were entered into and engaged in with the purpose and effect of restraining interstate commerce in an effort to lessen and restrict competition between plaintiff on the one hand and Shell Oil Company and the co-conspirators on the other.

24. Shell Oil Company's unlawful conduct has included, but is not limited to, (a) its combination with Seaway Coal, Seaway Terminal, and R&F Coal (by acquisition of Seaway Coal, and its subsidiaries Seaway Terminal and R&F Coal), in order to establish Shell Oil Company (i) as a dominant marketer of competitive sources of energy, oil and coal, in the same geographical area, and (ii) as a dominant marketer of coal to the TVA; and (b) causing, in whole or in part, R&F Coal to breach its March 19, 1976 contract with Havoco, Exhibit B hereto, by not paying to Havoco any of the commissions due and payable thereunder.

25. The purpose, intent, and effect of the unlawful contracts, combination and conspiracy alleged herein was to damage and injure plaintiff, the public, and the trade by destroying plaintiff's competitive position as an established marketer of coal and producer of oil. As a result, competition in interstate commerce has been lessened and restricted, with a harmful effect on prices and on the availability of choices to customers for coal and oil. Plaintiff was a competitor, and still is a potential competitor, of defendant Shell Oil Company's R&F Coal subsidiary, of Hilco, Inc., and of Hill in the marketing of coal to the TVA and others. In addition, plaintiff was, and still is a competitor of Shell Oil Company in the production of oil.

26. As Shell Oil Company and its co-conspirators knew, the contract between plaintiff and R&F Coal was one of the most valuable assets plaintiff owned, and performance by R&F Coal of its obligations under that contract was essential to plaintiff's economic viability.

27. In addition, Shell Oil Company is one of the largest oil producers in the world, while plaintiff is a small, independent oil producer. Destruction (or substantially [sic] weakening) of plaintiff would serve Shell Oil Company's ends by reducing competition in oil production.

28. If allowed to continue, the unlawful contracts, combination, and conspiracy alleged herein will have precisely the effect Shell Oil Company and its co-conspirators intended. As a direct result, plaintiff has been unable to engage in further marketing of coal in competition with the co-conspirators (including Shell Oil Company's R&F Coal subsidiary), and has been unable to expand its activities as an independent oil producer.

knowledge of intent may help the court to interpret facts and to predict consequences.

*Id.* at 238, 38 S.Ct. at 243. In applying this test to cases where the challenged restraint took the form of unfair competition, we think that the market power of the defendant, both before and after the allegedly anticompetitive conduct is a particularly important factor. It is not the unfair means which may have been employed by the defendant that fall within the purview of the Sherman Act. Rather, the sole question is whether those means lessened competition. As noted above, unfair competition is still competition, and will be actionable under the antitrust laws generally only where a defendant with substantial market power uses the unfair means to increase its share of the market by eliminating a competitor, thereby creating the risk of a monopoly.

■■ We do not think Havoco's allegations are adequate in this regard. Havoco's attempt to allege anticompetitive effect is two pronged. The first contention is that the conspiracy between Shell and its subsidiaries was undertaken with the purpose of establishing Shell as a dominant marketer of competitive sources of energy, coal and oil, in the same geographic area. This theory was advanced only after the district judge granted Shell's initial motion to dismiss. Not only is the allegation conclusionary, but further, the complaint is utterly devoid of any supporting factual allegations. *All* of the conduct complained of related solely to the sale of coal to TVA. While we agree with the recent decision of the Tenth Circuit in *Perington Wholesale, Inc. v. Burger King Corp.,* No. 77–1877 (10th Cir. 1979), to the effect that our system of notice pleading requires only that the complaint give opposing parties fair notice of the basis of the claim against them so that they may respond, and be sufficient to establish a legal right to relief, even this forgiving standard is not met with respect to the oil-related allegations. We are simply unwilling to construe pleadings so liberally as to imply a comprehensive scheme to monopolize competing energy sources where

the only mention of such a "conspiracy" in the complaint is the naked statement that one exists.

■■ Havoco's second theory, that the anticompetitive effect is shown through the allegation that Shell has established itself as a "dominant marketer of coal to the TVA," fails for a different reason. Although the factual allegations in support of that claim are adequate, a loss by the plaintiff of a single contract with a single purchaser is simply not equivalent to a deleterious effect on the market. While a determination of the relevant market for purposes of Section 1 does not necessarily involve the complexities involved in making the same determination for purposes of Section 2, there must be some allegation of a harmful effect on a more generalized market than TVA. *See George R. Whitten, Jr. v. Paddock Pool Builders, Inc., supra,* 508 F.2d at 562. Otherwise the mere fact that one party bid successfully against another party for a contract would be equivalent to an anticompetitive effect and would raise the specter of an antitrust action being used as a remedy for any tortious conduct during the course of the competition. This would be contrary to the repeated view of the Supreme Court that the antitrust laws do "not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce." *Hunt v. Crumboch,* 325 U.S. 821, 826, 65 S.Ct. 1545, 1548, 89 L.Ed. 1954 (1945).

■■ Further, by Havoco's own averments, even with respect to TVA, the number of competitors in that market has increased by virtue of Hilco's entry, and Havoco itself remains a potential, if currently unsuccessful, competitor. An analogous situation was presented in *Parmalee Transportation Co. v. Keeshin,* 292 F.2d 794 (7th Cir. 1961), *cert. denied,* 368 U.S. 944, 82 S.Ct. 376, 7 L.Ed.2d 340. In that action the plaintiff had been deprived of a contract to transport passengers between various railway stations in Chicago because an interested member of the ICC had improperly applied pressure to ensure that the contract

was awarded to the defendant. The absence of anticompetitive effect on the market was found determinative:

An assertion that the competitive market for the contract was destroyed or that the competition for it was eliminated is belied by the record. While one competitor succeeded and necessarily the other failed, unmistakably there was very strenuous competition. This unavoidable fact undermines plaintiff's challenge under Sections 1 and 2 of the Sherman Act. Nor is this result precluded by the fact . . . that the victory of the successful bidder was made easier by the wrongful conduct of a public official. Assuming the record presented as to his involvement reflects the truth . . . any party damaged thereby has . . . a ground for relief in the courts of this country. However, the use of conventional antitrust language in drafting a complaint will not extend the reach of the Sherman Act to wrongs not germane to that Act, even though such wrongs be actionable under state law.

*Id.* at 804. We think these observations have special relevance in this context as well. To permit so narrow a definition of the "market" adversely affected [6] would have more of a tendency to discourage than to protect competition, the ward of the antitrust laws.

Havoco's complaint details a scenario of unsavory and reprehensible business practices, all of which are actionable in a state forum. We note our agreement with the district court's observation that "[i]t is hard to ignore the suspicion that the facts have been forced into an antitrust mold to achieve federal jurisdiction." We have noted previously the Supreme Court's dictate in *Poller v. Columbia Broadcasting System, Inc., supra,* that summary procedures be used sparingly in complex antitrust litigation. We do not read this pronouncement,

as Havoco apparently would urge, to require the federal courts to put on blinders when presented with state law causes of action which have been contorted into antitrust language. We have carefully considered the allegations in the complaint and have concluded that no claim for relief under the Sherman Act is stated.

The judgment of the district court is affirmed.

---

**6.** There is no allegation here, nor could there be, that TVA represents the entire market for coal, either nationally or within a defined geographic area. While we need not decide the question here, we acknowledge that a situation where a single purchaser represented the entire market for a commodity would be distinguishable, and that effect on such a market might in some circumstances be sufficient to meet the anticompetitive effect element of a Section 1 violation.