Frank McNEIL, William H. Washington, Sr., Rudolph V. Davenport, Archie Lawrence, and Howard Veal, Sr., Plaintiffs,

v.

SPRINGFIELD PARK DISTRICT and the Springfield Election Commission, Defendants,

Frank McNEIL, William H. Washington, Sr., Rudolph V. Davenport, Archie Lawrence, and Howard Veal, Sr., Plaintiffs,

v.

SPRINGFIELD SCHOOL DISTRICT NO. 186 and the Springfield Election Commission, Defendants.

Nos. 87–3016, 87–3017.

United States District Court, C.D. Illinois, Springfield Division.

Aug. 13, 1987.

Donald M. Craven, Springfield, Ill., for plaintiff.

Robert C. Walbaum, and Paul Bown, Springfield, Ill., for Springfield Park Dist.

John L. Swartz, Springfield, Ill., for Springfield School Dist.

Thomas R. Appleton, and Thomas H. McGary, Springfield, Ill., for Springfield Election Comm.

James C. Franczek, Jr., Michael G. Cleveland, Andrea R. Waintroob, Chicago, Ill., for Springfield School Bd.

## OPINION ORDER

MILLS, District Judge:

Voting Rights Act violation?

No.

Summary judgment for the School District and the Park District.

These cases have been consolidated for purposes of ruling on Defendants' motions for summary judgment. Plaintiffs' complaints challenge the method of electing park board trustees and school board members under § 2 of the Voting Rights Act, 42 U.S.C. § 1973, asserting that the at-large election systems impair the ability of minority voters to elect representatives of their choice.

## I—PROCEDURAL HISTORY

After the filing of the complaint in the park district suit, Plaintiffs moved for a preliminary injunction on March 9, 1987. On March 20, 1987, this Court held a hearing on the motion and denied the request to enjoin the upcoming elections. On April 2, 1987, we entered a written opinion fully setting out our reasons for denying injunctive relief. *McNeil v. Springfield Park District*, 656 F.Supp. 1200 (C.D.Ill.1987).

Following the period of discovery, Defendants moved for summary judgment on June 17, 1987. Plaintiffs requested and were granted an extension of time in which to respond and filed their response on July 24, 1987. We have considered the extensive memoranda submitted by the parties along with the affidavits and other supporting materials of record. The motion is now ripe for our ruling.

The school district suit has followed approximately the same time table with the exception of the timing of the preliminary injunction motion. Plaintiffs' motion for a preliminary injunction was filed on May 19, 1987. The motion is still pending; however, our decision on the summary judgment motion moots the question of whether Plaintiffs are entitled to preliminary relief.

## II—FACTS

### A. *School District*

#### 1. Present Election System

Defendant Board of Education is a seven-member body established under the School Code of the State of Illinois, Ill.Rev. Stat. ch. 122, to manage and govern the schools within District 186. Positions on the board of education are unpaid. Ill.Rev. Stat. ch. 122, ¶ 10–10 22–1 (1985).

Elections to the board are at-large and non-partisan. Ill.Rev.Stat. ch. 46, ¶ 2A–1.-2(e)(1), and ch. 122, ¶¶ 10–3, 10–4 and 10–10 (1985). There are no limits to how many candidates may appear on the ballot; any adult citizen of the district who files a timely nomination petition with 50 signatures may appear on the ballot. Ill.Rev. Stat. ch. 122, ¶ 9–10 (1985). There are no primaries or majority vote requirements for elections to the school board. Ill.Rev. Stat. ch. 46, ¶ 2A–1.2(e)(1), and ch. 122, ¶¶ 10–3, 10–4, and 10–10 (1985).

Prior to 1981, members of the board served staggered 3–year terms. Ill.Rev. Stat. ch. 122, ¶¶ 10–4, 10–10 (1979). Elections were held each year in April for two or three open seats. *Id.* Because of a change in state law in 1981, board members are now elected to 4–year terms and elections are held in November of every odd-numbered year. The year 1983 was a transitional one. Ill.Rev.Stat. ch. 122, ¶¶ 10–4 and 10–10. That election involved two 2–year terms and three 4–year terms.

#### 2. Population Data

According to the 1980 United States Census, the population of District 186 is 122,-997, of which 110,485 are white (89.82%), 11,217 are black (9.1%), and 1,295 (1%) are members of other races.

Because 95.7% of all blacks who live in District 186 reside within the city of

Springfield, if District 186 were to be divided into 7 single-member districts, any majority black district which might be drawn must be, for all practical purposes, within the city. The 1980 census shows that the total population of the city is 99,637, of which 87,719 are white (88%), 10,735 are black (10.77%), and 1,165 (1.17%) are members of other races. The voting age population of the city is 74,257, of which 67,178 are white (90.46%), 6,345 are black (8.54%), and 734 are members of other races (.98%).

### 3. The Proposed District

Generally accepted standards for redistricting require that districts should be drawn which are compact and geographically contiguous and equal in population. It is generally recognized that, where equal population districts are not drawn, any variance should be based on rational policy, such as following neighborhood lines or precinct boundaries.

With this standard in mind, the parties agree that the school district should be divided into seven districts. Accepting the facts and inferences most favorable to Plaintiffs, a single member district could be drawn which would contain a 50.2%–50.4% black majority. However, again drawing the inferences most favorable to Plaintiffs, a district cannot be drawn where blacks constitute a voting age majority. Defendants' evidence places the percentage of voting age blacks in this district at 43.2%. Plaintiffs do not refute this evidence in any of their affidavits or other submissions in the record.

### B. Park District

The facts are virtually the same in the park district suit. The only major point of departure is an initial disagreement as to whether the park district should be divided into six or seven single-member districts. Because of our ultimate disposition, we need not decide that question here. Therefore, we will assume that Plaintiffs are correct in stating that the park district should be divided into seven single member districts.

Using the seven districts as the standard, the numbers shake out roughly the same way as the school district. Blacks can maintain a 50.2% majority in a single district. Blacks cannot comprise a majority in a single district when voting age population figures are used. Defendants' figures indicate that blacks would constitute 43.7% of the proposed district when voting age population figures are used.

Plaintiffs have not refuted this evidence.

### III—SUMMARY JUDGMENT STANDARD

Under Rule 56(c), summary judgment should enter "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no *genuine* issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Unquestionably, in determining whether a genuine issue of material fact exists, the evidence is to be taken in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970). Nevertheless, the rule is also well established that the mere existence of *some* factual dispute will not frustrate an otherwise proper summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Thus, the "preliminary question for the judge [is] not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." *Id.* 106 S.Ct. at 2511, *quoting Improvement Co. v. Munson*, 14 Wall. 442, 448, 20 L.Ed. 867 (1872); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In other words, the Court must consider the evidence "through the prism of the substantive evidentiary burden" in deciding Defendants' motion. *Anderson*, 106 S.Ct. at 2513; *Carson v. Allied News Co.*, 529 F.2d 206, 210 (7th Cir.1976). Applying this standard, the Court now turns to the case at bar.

### IV—LAW AND ANALYSIS

#### A.

Plaintiffs first argue that the use of summary procedures by the Court is inap-

propriate in the context of the complex issues raised by this voting rights litigation. For that proposition they cite *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), where the Supreme Court observed that "[s]ummary procedures should be used sparingly in complex anti-trust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot."

*Poller* is correct as far as it goes; however, it has never gone so far as to create a "complexity" exception to Federal Rules 12(b)(6) and 56. *See, e.g., Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir.1984); *Havoco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549, 553 (7th Cir. 1980).

The typecast of the issues raised do not necessarily determine whether summary judgment is required. As is true in any other case before us on a motion for summary judgment, the propriety of granting the motion is dependent on the interplay of the facts and law presented and the application of those facts and law to the standard enunciated in Rule 56. To treat any given case otherwise would "represent an abdication of our judicial responsibility." *Havoco*, 626 F.2d at 553.

In any event, motive and intent do not play a role in this case. The Voting Rights Act created a strictly results-based test and this case may properly be decided upon the undisputed facts before us.

### B.

■ Although the parties have argued additional issues, the Court believes that this motion presents a single question: Can Plaintiffs bear the burden of proving that the minority group is "sufficiently large and geographically compact to constitute a majority in a single member district"? *Thornburg v. Gingles*, —— U.S. ——, 106 S.Ct. 2752, 2766, 92 L.Ed.2d 25 (1986).

The Supreme Court spoke of the above-stated quotation as one of three necessary preconditions to establishing a violation of § 2 of the Voting Rights Act. *Id.* Thus, if a class of plaintiffs fails on the proof of this condition, the defendant must prevail.

Here, Plaintiffs argue that the affidavits of their expert, Dr. Race Davies, establishes that blacks constitute a 50.2% majority in a single member district. They argue that this enables them to clear the first hurdle of *Thornburg*. We agree, as we must, on the motion for summary judgment, with Plaintiffs' evidence establishing that a single member district can be drawn containing a 50.2% black majority. This does not, however, lead us to Plaintiffs' ultimate conclusion that the first element of the *Thornburg* criteria has been met.

■ The reason for our disagreement is our belief that Plaintiffs have proceeded on a faulty legal premise. Plaintiffs' premise is that *Thornburg* only requires plaintiff class to demonstrate that it can constitute a bare majority in a single member district. Plaintiffs maintain that *Thornburg* should be read as requiring a simple majority based on the total population of the district. Defendants counter by arguing that the population figures should be derived from the total voting age population as opposed to the total population. We agree with Defendants that "majority" as it is used in *Thornburg* refers to the voting age population rather than the total population.

Defendants' position is supported by three arguments. First, language in *Thornburg* itself indicates that the Court was referring to a voting age majority. Second, the district court opinion which spawned the *Thornburg* case supports the use of a voting age majority, as does additional case law. And three, a logical interpretation of the Voting Rights Act compels the use of a voting age majority to determine whether minority voters are injured as a result of the challenged voting structure.

As we noted earlier, *Thornburg* held that in order to maintain a successful challenge to an existing form of government under the Voting Rights Act a minority group must show that "it is sufficiently large and geographically compact to constitute a majority in a single member dis-

trict." *Thornburg,* 106 S.Ct. at 2766. Read literally and without further elucidation, this could be construed as requiring only a population majority. Plaintiffs ask us to interpret the language in this manner. However, the Supreme Court's explanation for this threshold test calls for a different interpretation. The Supreme Court explained:

> The reason that a minority group making such a challenge must show, as a threshold matter, that is sufficiently large and geographically compact to constitute a majority in a single member district is this: unless *minority voters possess the potential to elect representatives* in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice. The single-member district is generally the appropriate standard against which to measure *minority group potential to elect* because it is the smallest political unit from which its representatives are elected. Thus, if the minority group is spread evenly throughout a multi-member district, or if, although geographically compact, the minority group is so small in relation to the surrounding white population that it could not constitute a majority in a single-member district, *these minority voters* cannot maintain that they would have been able to elect representatives of their choice in the absence of the multi-member electoral structure. As two commentators have explained, "to demonstrate [that *minority voters* are injured by at-large elections], the *minority voters* must be sufficiently concentrated and politically cohesive that a putative districting plan would result in districts in which members of a racial minority would constitute a majority of the voters, whose clear electoral choices are in fact defeated by at-large voting. If *minority voters'* residences are substantially integrated throughout the jurisdiction, the at-large district cannot be blamed for the defeat of the minority-supported candidates. ... [This standard] thus would only protect racial *minority voters* from diminution proximately caused by the district-

ing plan; it would not assure racial minorities' proportional representation." (Emphasis ours.)

*Thornburg,* 106 S.Ct. at 2766–67, n. 17 (*citing* Blacksher & Menefee, *From Reynolds v. Sims to City of Mobile v. Bolden: Have the White Suburbs Commandeered the Fifteenth Amendment?,* 34 Hastings L.J. 55–56 (1982)).

What is readily apparent from the Court's reasoning is that the threshold test focuses on minority voters' potential to elect representatives of their choice. Only those members of the minority who are eligible to vote can affect this potential to elect. It is not surprising that the Court's language frequently refers to minority voters. Hence, we believe that the Court was implicitly adopting the minority voting age population as its point of reference. We are confident that if directly confronted with the question, the Supreme Court would acknowledge that the voting age population is the relevant figure to be used in determining if the Plaintiffs can meet the first element of *Thornburg.*

Furthermore, we do not have to look far to find an explicit adoption of voting age population as the appropriate measuring stick. In *Gingles v. Edmisten,* the district court found that "no aggregation of less than 50% of an area's voting age population can possibly constitute an effective voting majority." 590 F.Supp. 345, 381 n. 3 (E.D.N.C.1984), *aff'd in part, rev'd in part sub nom, Thornburg v. Gingles,* — U.S. —, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). The district court created a low side limit which a voting rights plaintiff must overcome in order to prevail. *Id.* At this point, it is strictly a numbers game and no other factors need be examined. This of course comports with the "results" oriented approached which Congress sought to implement in the Voting Rights Act. *Thornburg,* 106 S.Ct. at 2759.

The Supreme Court did not disturb this portion of the district court's opinion and we believe implicitly adopted it. Other courts are in agreement with this conclusion. *See, e.g., Latino Political Action Committee v. City of Boston,* 609 F.Supp.

739, 747 (D.Mass.1985), *aff'd,* 784 F.2d 409 (1st Cir.1986); *Martin v. Allain,* 658 F.Supp. 1183 (S.D.Miss.1987).

Finally, common sense dictates that we use the voting age population as our point of reference. When speaking of vote dilution or potential to elect representatives, you necessarily speak of voters. Those not eligible to vote do not enter into the calculations. Hence, a test which incorporates non-voters improperly skews the balance against defendants. For these reasons we find that the minority voting age population is the determining factor for purposes of deciding whether Plaintiffs meet the first pre-condition of *Thornburg.* We now turn to the question of whether summary judgment is appropriate when utilizing the minority voting age population as the appropriate standard.

### C.

█ Plaintiffs have brought no evidence showing that blacks would constitute a majority of the voting age population in their proposed district. Both the park district and school district have submitted affidavits that place the voting age population in Plaintiffs' proposed district below 50%. The park district's affidavits show a black voting age population of 43.7% in the proposed district. The school district's affidavits reach a result of 43.2%. At trial, Plaintiffs would bear the burden of proving that the black voting age population would be 50% or greater in their proposed district.

The burden of the moving party is to show that there is no genuine issue of material fact. The moving party may support its motion with affidavits and similar material. Fed.R.Civ.P. 56(e). If through its supporting materials the moving party has demonstrated the absence of a genuine issue of material fact, then under Rule 56(e) the burden shifts to the nonmoving party to show evidence of a genuine issue of material fact. The moving party cannot thereafter rely on its pleadings. Wright, Miller & Kane, Federal Practice & Procedure, Civil 2d, § 2739 (1983).

Here, Defendants' figures as to the voting age population have not been rebutted by any of Plaintiffs' affidavits or other supporting materials. Hence, Defendants have met their burden of showing the absence of a genuine issue of material fact.

And "the plain language of Rule 56(c) *mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

Defendants have met their burden of showing an absence of a genuine issue of material fact and Plaintiffs have failed to make a sufficient showing establishing the existence of a key element to their case on which they bear the burden of proof at trial. Therefore, summary judgment in favor of Defendants is mandated.

### V. CONCLUSION

*Ergo,* the motions for summary judgment filed by Springfield School District No. 186 and by the Springfield Park District are ALLOWED. Judgment is entered in favor of the Defendants and against the Plaintiffs.

All other pending motions are denied as moot.

Cases CLOSED.