R.W. INTERNATIONAL, INC., Thomas
H. Ward, and International Food
Distributors, Inc., Plaintiffs,

v.

BORDEN INTERAMERICA, INC. and
Borden, Inc., Defendants.

Civ. No. 85–1141 (JAF).

United States District Court,
D. Puerto Rico.

Nov. 24, 1987.

Geoffrey M. Woods, Woods & Woods, San Juan, P.R., for plaintiffs.

Leonardo Andrade Lugo, Goldman & Antonetti, San Juan, P.R., for defendants.

## OPINION AND ORDER

FUSTE, District Judge.

This lawsuit arises out of activities beginning in June, 1983, when co-defendant Borden Interamerica, Inc. ("Interamerica"), a subsidiary of co-defendant Borden, Inc. ("Borden"), acquired the distribution rights of co-plaintiff corporation International Food Distributors, Inc. ("International"), through an agreement with its president, co-plaintiff Thomas Ward. Included in the agreement of sale was the covenant that Ward would not compete in the wholesale distribution of frozen food and dairy products so long as Interamerica carried on the distributorship assigned by the agreement.

We need not at this point list the goings on after the agreement was signed except to note that they spawned two lawsuits. The first, a state court action filed by co-defendant Interamerica, alleges that Ward violated the non-competition covenant. This, the second suit, consists of several causes of action under local tort and contract law, along with allegations of violations of federal antitrust law, specifically 15 U.S.C. Sections 1 and 2.

This case is before us now with a complex and prolific procedural history. A pretrial order was issued on September 10, 1985, after co-defendant Interamerica had filed its motion to dismiss for lack of diversity jurisdiction and its motion for summary judgment as to the antitrust claim.[1] That order set a schedule for discovery concerning both the jurisdictional and substantive issues. By the end of October, 1985, plaintiffs' oppositions to defendants'

---

1. Pursuant to a motion filed by codefendant Borden in October, 1987 and a subsequent order by this court, all of codefendant Interamerica's motions are adopted by Borden.

motions were due unless plaintiffs had indicated to the court that further depositions would be necessary.

Only one deposition was taken; on October 1 and October 2, 1985, Miguel Simonet, the president of Interamerica was deposed by plaintiffs, solely on matters concerning the principal place of business of Interamerica. Matters touching upon the antitrust claims were not addressed, then or after the deadline for exploring such issues had passed.

After a flurry of replies and surreplies on both the antitrust and diversity issues, along with the injection of an amended complaint, and the reassignment of the case to the writing judge, the matter stands submitted on both of defendants' motions.

Because plaintiffs were on notice that this court's jurisdiction was being contested via the scheduling order, as well as defendants' dispositive motions, we now, pursuant to *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986), dismiss all of plaintiffs' claims. The antitrust claims fail to sufficiently state a cause of action and the state law claims are dismissed for lack of diversity jurisdiction.

### I. The Antitrust Claims

Plaintiffs seem to contend several different antitrust violations in their amended complaint. The most obvious—the sixth cause of action—sounds wholly in antitrust, alleging violations of sections 1 and 2 of the Sherman Act. An exploration of the requirements of federal antitrust claims reveals that plaintiffs have failed to allege the necessary elements to sustain an antitrust cause of action.

### A.

■ To successfully claim a violation of Section 1 of the Sherman Act, contracting or conspiring in restraint of trade, plaintiffs must allege that defendants' actions resulted in damage to competition as a whole in the relevant market, and not just to themselves as a particular competitor. *White v. Hearst Corp.,* 669 F.2d 14, 18 (1st Cir.1982); *Americana Industries v. Wom-*

*etco de P.R.,* 556 F.2d 625, 627 (1st Cir. 1977); *Havoco of America v. Shell Oil Co.,* 626 F.2d 549, 554–59 (7th Cir.1980); *ADM v. Sigma,* 628 F.2d 753, 754 (1st Cir.1980); *Medical Arts Pharmacy of Stanford Inc. v. Blue Cross & Blue Shield of Connecticut Inc.,* 675 F.2d 502, 504 (2nd Cir.1982). This information may not be "developed" at trial; it must be pleaded originally in the complaint or readily available during discovery proceedings. "[T]he absence of a sufficient allegation of anti-competitive effects in a Sherman Act complaint is fatal to the existence of the cause of action." *Havoco,* 626 F.2d at 554.

■ The complaint alleges only that the purchase of International and inclusion of the covenant not to compete were actions in restraint of trade. Plaintiffs do little more to buttress that allegation than offer International President Ward's assertion in his affidavit that Interamerica head Simonet admitted the actions were in truth an attempt to monopolize the frozen food market in Puerto Rico, along with Ward's claim that International was "the only real competitor [to Interamerica] in Puerto Rico." We note here that the enforcement of covenants not to compete are neither *per se* antitrust violations nor *per se* permissible. Instead, they are subject to judicial scrutiny on a case-by-case basis under the Rule of Reason. *Lektro–Vend Corp. v. Vendo Co.,* 660 F.2d 255, 267–69 (7th Cir. 1981), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982). Nonetheless, plaintiffs' assertions, without verifiable information concerning the composition of and damage to the relevant market, do not make a colorable federal antitrust claim. *Americana Industries,* 556 F.2d at 627–28; *Havoco,* 626 F.2d at 558.

### B.

Plaintiffs also allege and defendants also deny that the purchase of International and the inclusion and attempted enforcement of the covenant not to compete were attempts to monopolize the frozen food and dairy market in Puerto Rico. (We are unable to discern from the pleadings any claim that

defendants *actually* monopolized that market). The Section 2 allegations also fall short of stating an antitrust claim in federal court.

■ To succeed at trial on a Section 2 claim, plaintiffs must establish an intent to monopolize as well as a dangerous probability of success in a relevant market. *George R. Whitten Jr., Inc. v. Paddock Pool Bldrs., Inc.*, 508 F.2d 547, 550 (1st Cir.1974), *cert. denied*, 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975); *C.R. Bard Inc., v. Medical Electronics Corp.*, 529 F.Supp. 1382, 1390 (D.C.Mass.1982). *See also Lektro–Vend Corp.*, 660 F.2d at 270 (proof of an attempt to monopolize requires: "(1) a specific intent to monopolize, i.e., to gain the power to control prices or to exclude competition in a line of commerce, (2) predatory or anticompetitive acts engaged in to further the purpose to monopolize, and (3) a dangerous probability of success in the relevant market which requires evidence that the defendant had sufficient market power to have been reasonably able to create a monopoly.") (citations omitted). A colorable claim, thus, must include evidence of the market power of the defendants and, therefore, must, like Section 1 claims, include facts defining the relevant market. *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965); *Gilbuilt Homes, Inc., v. Continental Homes, etc.*, 667 F.2d 209, 211 (1st Cir.1981); *Paddock Pool Bldrs.*, 508 F.2d at 550; *C.R. Bard, Inc.*, 529 F.Supp. at 1390.

■ Like the First Circuit, "[w]e do not think that a bare allegation, 'on information and belief', of malice and a specific intent to put the plaintiffs out of business can save a complaint that fails to allege facts and circumstances tending to show that the defendant has substantial market power." *Americana Industries*, 556 F.2d at 627–28. *See also Hennessy Industries Inc., v. FMC Corp.*, 779 F.2d 402, 405 (7th Cir.1985) ("The complaint does not set forth any facts from which we can infer that defendants had sufficient market power to have been able to create a monopoly.").

Plaintiffs have not fully alleged a Section 2 violation and cannot be permitted to proceed on their insufficient complaint.

### C.

■ The complaint, as amended, contains in each other state-law based cause of action the paragraph that the state law violations constituted monopolization or attempts to monopolize the frozen food market in Puerto Rico. To the extent that these represent federal antitrust claims they are dismissed for lack of standing, since plaintiffs have not alleged the requisite "antitrust injury" making the Sherman Act applicable. Plaintiffs would have been injured despite any damage to the market, and, thus, were not injured by any resultant lack of competition, but rather by the state law violations complained of. As in *Turner v. Johnson & Johnson*, 809 F.2d 90, 102 (1st Cir.1986), "[t]he alleged injury to plaintiffs here unquestionably flowed from the alleged [state law violation] and not from suppressed competition in the ... market." Those claims are, therefore, denied. *See also Southaven Land Co., Inc. v. Malone & Hyde, Inc.*, 715 F.2d 1079 (6th Cir.1983) (plaintiff lacked standing when no causal connection existed between anticompetitive action and plaintiff's alleged injury); *Nishimura v. Dolan*, 599 F.Supp. 484, 494–97 (E.D.N.Y.1984) (breach of contract or tort does not rise to level of injury the antitrust laws were designed to prevent).

### II. The Diversity Issue

■ We turn now to defendants' motion to dismiss due to a lack of diversity among the parties. Plaintiffs assert that the citizenship of Interamerica is located in New York or in Ohio, the location of the headquarters of the parent, Borden, Inc. Defendant Interamerica contends that it is a citizen of Puerto Rico. Since six of the seven causes of action are state law claims, inasmuch as all of the plaintiffs, corporate and individual, are citizens of Puerto Rico, and since there must be complete diversity in order for the state law claims to be heard in federal court, *Owen Equipment*

*and Erection Co. v. Kroger,* 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978), the decision as to the citizenship of Interamerica is of no small consequence to the suit.

The citizenship of a corporation for diversity purposes is both the place of incorporation and the principal place of business of the company. 28 U.S.C. sec. 1332(c). It is undisputed that Interamerica was incorporated in New York under a different name, that it has been authorized to do business in Puerto Rico since 1949, and that from 1972 it has been known as Borden Interamerica. We have determined that plaintiffs have not met their burden of proving a place other than Puerto Rico to be principal place of business of Borden Interamerica, and that, as a consequence, diversity jurisdiction does not exist for this suit.

When confronted with the common scenario of determining the principal place of business for a wholly-owned subsidiary (Interamerica) of a much larger parent corporation (Borden), we are guided at the outset by the words of the U.S. Supreme Court, which considered and granted the independence of one subsidiary more than 60 years ago:

> Through ownership of the entire capital stock and otherwise, the defendant dominates the [subsidiary] corporation, immediately and completely, and exerts its control both commercially and financially in substantially the same way, and mainly through the same individuals.... The existence of the [subsidiary] company as a distinct corporate entity is, however, in all respects observed. Its books are kept separate. All transactions between the two corporations are represented by appropriate entries in their respective books in the same way as if the two were wholly independent corporations. This corporate separation from the [parent's] business was doubtless adopted solely to secure to the defendant some advantage under the local laws.... The corporation separation, though perhaps merely

formal, was real. It was not pure fiction.

*Cannon Manufacturing Co. v. Cudahy Packing Co.,* 267 U.S. 333, 335–37, 45 S.Ct. 250, 251, 69 L.Ed. 634 (1925). *See also Topp v. Compair, Inc.,* 814 F.2d 830, 836 (1st Cir.1987); *Quaker State Dyeing & Finishing Co. v. ITT Terryphone Corp.,* 461 F.2d 1140, 1142 (3rd Cir.1972).

An examination of the facts leads us to conclude that the separation between Interamerica and Borden, Inc. is more than formal and indeed real. Interamerica was incorporated separately from Borden, Inc. Like the corporation described by the Supreme Court in *Cannon,* its books are separately kept and transactions between parent and subsidiary are recorded in independent ledgers. Although some of the Directors of Interamerica are also on the Board at Borden, the two Boards are nonetheless separate entities, as is the management team at Interamerica, which is comprised apparently completely by residents of Puerto Rico.[2] Thus, the existence of the subsidiary Interamerica is more than just as the agent or "alter ego" of its parent, as plaintiffs would have us believe.

The fact that we have chosen not to pierce the corporate veil at this juncture is not, however, dispositive. We hold simply that Interamerica is entitled to a determination of its *own* principal place of business, which in the final analysis may or may not be different from that of its parent.

The most recent First Circuit opinion discussing such an analysis with respect to a subsidiary notes "there are three distinct, but not necessarily inconsistent tests for determining a corporation's principal place of business." *Topp,* 814 F.2d at 834. The first is the widely cited and nearly as widely diluted "nerve center" test first enunciated in *Scot Typewriter Co. v. Underwood Corp.,* 170 F.Supp. 862 (S.D.N.Y.1959). Under that test, courts are instructed to look at the "totality of corpo-

---

**2.** In addition to Simonet, Héctor L. Mirabal, the General manager, "primarily responsible for the day-to-day operations and sales of the company," José A. Rivera, the Comptroller, "who directs all the financial functions of the company," Eliseo Rivera, General Sales Manager, and José M. Torres, Operations Manager, all reside in Puerto Rico.

rate activity at a given place," 170 F.Supp. at 865. Second, is the standard articulated in *Kelly v. United States Steel Corp.*, 284 F.2d 850 (3rd Cir.1960) stating that the principal place of business of a corporation is its "center of corporate activity" where the bulk of the day-to-day management takes place. Finally, there is the test applied by the court in *Inland Rubber Corp. v. Triple A Tire Service, Inc.*, 220 F.Supp. 490 (S.D.N.Y.1963). There, citizenship was determined by the "locus of the operations of the corporation," where the bulk of the physical operations take place. *Topp*, 814 F.2d at 834.

The precise interrelationship of these three tests is difficult to determine. Perhaps Judge Campbell put it best in a footnote in *Topp* when he stated, "what is sought, except in rare circumstances where the corporate veil is properly disregarded, is the operational center of the corporation in question, *giving proper regard to the corporate identity*—not necessarily the ultimate 'nerve center,' in the sense of the place where the real power resides." *Topp* at 835. (Emphasis in original).

For that reason, we think it most helpful to utilize the following list of factors enunciated in *Topp:*
Location of corporate headquarters;
location of directors' meetings;
location from where corporate income tax return is filed;
location of corporate records;
location of principal bank accounts;
location of corporate personnel who direct the daily operations of the corporation;
place where major policy decisions are made;
place which is designated in the charter or other corporate documents as the official headquarters of the company.
*Topp*, 814 F.2d at 837-8, citing 1 *Moore's Federal Practice* Para. 0.77[3.–2] and cases cited therein.

In applying those factors to the case at bar, we ought first to note that in this case, as in the cases we have cited, there is no obvious choice as to the principal place of business. The balance of the factors is determinative, but that determination is rarely clear-cut. In this instance, we have tried to fairly apprise the control over Interamerica, mindful all the while that the plaintiffs bear the burden of proving the jurisdictional basis of this court.

As noted previously, Interamerica was separately incorporated from its parent, Borden, Inc. The corporation has not owned or leased any real estate other that what it leases and owns in Puerto Rico and its sole business has been the distribution of food products in Puerto Rico. Interamerica has no other source of income than the operations in Puerto Rico and the United States Virgin Islands.

On the other hand, of its four-man Board of Directors, only two are residents of Puerto Rico, while the others are New York domiciliaries. Of the officers, only Miguel Simonet, the President, and José Betancourt, the Treasurer, reside in Puerto Rico; the rest, including the man Simonet thinks of as his "boss," George Waydo, live in New York. Board of Directors meetings are held in the States, and the corporate records are kept there. Some financial records, however, remain in Puerto Rico, since accountants there do the auditing of the books. The location of the Board of Directors meetings cannot be dispositive, however, when so much of the control takes place where the subsidiary is located.

While the Borden people in New York, and in Columbus, Ohio, the official headquarters of the parent, certainly do have control in the same way any parent controls a subsidiary corporation, Puerto Rico still remains the "operational center." The Puerto Rico management team makes many of the corporation's crucial decisions. Those concerning personnel matters (except the selection of the president), in addition to nearly total supervision of the daily activities of Interamerica—the sales and distribution of mostly frozen and dairy products—take place in Puerto Rico. Advertising, inventory and product line decisions are made in Puerto Rico as well.

Plaintiffs make much of Interamerica's several bank accounts. It is difficult to pinpoint the location of Interamerica's main

account. Money earned and used by the corporation flows through three—one in Puerto Rico, one in Ohio, and one in New York. Plaintiffs stress that the procedure of depositing and transferring earnings between and among these accounts was dictated by Borden, with no input from the Interamerica management, but the fact remains that wherever the money is kept the accounts of the subsidiary are kept separate from those of its parent.

We, therefore, hold that the significant control over Interamerica in Puerto Rico entitles the corporation to citizenship there. Plaintiffs have not met their burden of demonstrating a locus of control in any other state sufficient to displace that citizenship.

### III.

In sum, we rule as follows:

1. Plaintiffs' sixth cause of action is dismissed for failure to state an antitrust cause of action.

2. Any antitrust claims made in the other causes of action of the complaint are dismissed for lack of standing.

3. The six causes of action based on violations of state law are dismissed due to the lack of complete diversity among the parties, i.e., lack of diversity jurisdiction.

Judgment to be entered accordingly.

IT IS SO ORDERED.